1  MARC J. WINTHROP– State Bar No. 63218
   mwinthrop@winthropcouchot.com
2  KAVITA GUPTA – State Bar No. 138505
   kgupta@winthropcouchot.com
3  **WINTHROP COUCHOT**
   **PROFESSIONAL CORPORATION**
4  660 Newport Center Drive, Suite 400
   Newport Beach, CA 92660
5  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
6
7  General Insolvency Counsel for
   Debtor and Debtor-in-Possession

8

9                    **UNITED STATES BANKRUPTCY COURT**

10                   **CENTRAL DISTRICT OF CALIFORNIA**

11                        **RIVERSIDE DIVISION**

12  In re:                          │  Case No. 6:11-bk-12031 DS

13                                  │  Chapter 11 Proceeding

14  DAVID L. FARLEY,                │
                                    │  **DEBTOR'S MOTION FOR AN ORDER**
15                                  │  **APPROVING COMPROMISE OF**
              Debtor and           │  **CONTROVERSY AND SALE OF CERTAIN**
16            Debtor-in-Possession.│  **PATENTS; MEMORANDUM OF POINTS AND**
                                    │  **AUTHORITIES; AND DECLARATION OF**
17                                  │  **DAVID L. FARLEY IN SUPPORT THEREOF**
18                                  │  [11 U.S.C. § 363; Fed. R. Bankr. P. 9019]
19
                                    │  [No Hearing Requested]
20

21

22

23

24

25       **TO THE HONORABLE DEBORAH J. SALTZMAN, UNITED STATES BANKRUPTCY**

26  **JUDGE, CERTAIN CREDITORS AND PARTIES IN INTEREST:**

27

28

MAINDOCS-#161307-v1-Farley_2ndRevised9019(Final).rtf

1 | Pursuant to section 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")

2 | and Fed. R. Bankr. P. 9019, David L. Farley, the debtor and debtor-in-possession herein ("Debtor"), hereby

3 | moves ("Motion") the Court for an order approving the compromise ("Compromise") among the Debtor,

4 | Anatomic Global, Inc. ("AGI") and Foamex Innovations Operating Company ("FXI") by approval of the

5 | following agreements: (i) the Retention of Collateral and Release Agreement (the "Retention Agreement")

6 | by and among the Debtor, AGI and FXI, a copy of which is attached substantially in the form of Exhibit "1"

7 | to the Declaration of David L. Farley appended hereto ("Farley Declaration"), and (ii) the Patent Purchase

8 | Agreement (the "Patent Purchase Agreement") among the Debtor and FXI or one of its affiliates, a copy of

9 | which is attached substantially in the form of "Exhibit 2" to the Farley Declaration. Executed copies of the

10 | Retention Agreement and the Patent Purchase Agreement will be filed within the next 10 to 14 days. The

11 | Debtor, AGI and FXI are collectively referred to herein as the "Parties." The Compromise resolves all

12 | claims in the Debtor's case that have been asserted or could have been asserted by the Parties. The

13 | Compromise reflects the Parties determination to restructure the compromise reflected in the order entered

14 | on March 30, 2011 [Doc. No. 34] approving the Debtor's Motion for an Order Approving Compromise and

15 | Controversy, dated March 8, 2011 [Doc. No. 21], as supplemented by that certain Supplement to the

16 | Debtor's Motion for an Order Approving Compromise and Controversy, dated March 18, 2011 [Doc. No.

17 | 31].

18 | Good cause exists for granting this Motion. As set forth in the Farley Declaration, the terms of the

19 | Compromise are fair and reasonable and in the best interests of the Debtor, its estate, and its creditors. This

20 | Motion is made and based on the Memorandum of Points and Authorities and the Farley Declaration

21 | appended hereto, all pleadings, papers and other documents on file with the Court and such other evidence,

22 | both oral and documentary, that may be presented to the Court with respect to this Motion.

23 | **WHEREFORE**, the Debtor prays that this Court enter its order granting the following relief:

24 | 1.    Granting the Motion;

25 | 2.    Approving the Compromise;

26

27

28

3. Authorizing the Parties to enter into and execute all documents, including the Retention Agreement and the Patent Purchase Agreement, and take all acts necessary to effectuate the Compromise; and

4. Granting to the Debtor such other and further relief as the Court deems just and proper.

IF YOU DO NOT OPPOSE THE RELIEF REQUESTED BY THE MOTION, YOU NEED TAKE NO FURTHER ACTION. HOWEVER, IF YOU OBJECT TO THE RELIEF REQUESTED BY THE MOTION, PURSUANT TO LOCAL BANKRUPTCY RULE 9013-1, YOU MUST FILE YOUR OBJECTION AND REQUEST FOR A HEARING WITHIN FOURTEEN (14) DAYS OF THE DATE OF SERVICE OF THE MOTION WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT, LOCATED AT 411 WEST FOURTH STREET, SANTA ANA, CA 92701. YOU MUST ALSO SERVE A COPY OF THE OBJECTION AND REQUEST FOR A HEARING UPON THE DEBTOR'S COUNSEL AT THE MAILING ADDRESS INDICATED IN THE UPPER LEFT CORNER OF THE FIRST PAGE OF THE MOTION, AND UPON THE OFFICE OF THE UNITED STATES TRUSTEE LOCATED AT 411 WEST FOURTH STREET, ROOM 9041, SANTA ANA, CA 92701. UPON ANY RECEIPT OF A WRITTEN OBJECTION AND REQUEST FOR A HEARING, THE DEBTOR'S COUNSEL WILL OBTAIN A HEARING DATE ON THE MOTION AND GIVE APPROPRIATE NOTICE THEREOF. ANY FAILURE TO TIMELY FILE AND SERVE AN OBJECTION TO THE MOTION MAY RESULT IN ANY SUCH OBJECTION BEING WAIVED.

DATED: May 9, 2011

**WINTHROP COUCHOT
PROFESSIONAL CORPORATION**


By:    _/s/ Marc J. Winthrop_
       Marc J. Winthrop
       Kavita Gupta
       General Insolvency Counsel
       for Debtor and Debtor-in-Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

**A.    The Debtor.**

The Debtor is the Chief Executive Officer and sole director and shareholder of AGI.  The Debtor's income is derived solely from compensation for his services to AGI.   On January 21, 2011 (the "Petition Date"), the Debtor filed his voluntary Chapter 11 petition under Chapter 11 of the United States Bankruptcy Code.  Since the Petition Date, the Debtor has continued to function as a debtor and debtor-in-possession.

**B.    The Controversy.**

AGI is in the business of manufacturing foam mattresses and other sleep accessories.  FXI is AGI's major supplier of foam products.   On May 18, 2010, AGI and FXI entered into a Loan and Security Agreement ("Prior Loan Agreement") pursuant to which FXI loaned AGI the principal amount of $4,539,937.32.  AGI also executed an Amended and Restated Promissory Note (the "Amended and Restated Note") in favor of FXI.  In addition, the Debtor guaranteed the obligations of AGI to FXI (the "Guaranty").  On the same date, AGI entered into a Supply Agreement with FXI, pursuant to which AGI agreed to purchase 100% of its requirements for certain foam products from FXI, with certain limitations.

AGI subsequently received a $2.5 million revolving line of credit from Celtic Capital Corporation ("Celtic").  On November 10, 2010, FXI entered into a Debt and Lien Subordination Agreement with AGI and Celtic pursuant to which FXI agreed to subordinate its interest in AGI's collateral other than inventory to the interests of Celtic ("Subordination Agreement").  On the same date, AGI and FXI modified the Prior Loan Agreement by entering into an Amended and Restated Loan and Security Agreement ("Amended Loan Agreement") and a First Amendment to the Amended and Restated Promissory Note.

In order to induce FXI to enter into the Subordination Agreement and as consideration for the same, the Debtor entered into a pledge agreement pursuant to which he agreed to pledge his shares in AGI to secure the Guaranty.  In accordance with the pledge agreement, the Debtor's shares in AGI are currently being held in escrow by the Wilmington Trust Company and the Debtor was advised by his corporate counsel that a notice of default was all that was required to allow FXI to exercise rights in the collateral.

-4-

1    Based on FXI's assertion that AGI was in default of the Amended Loan Agreement, the Debtor was

2    concerned that FXI would attempt to seize his shares in AGI. Accordingly, he filed his petition to prevent

3    FXI from exercising its rights in his shares and to obtain a breathing spell within which to address the claims

4    of all creditors on a fair, equitable and uniform basis.

5    On February 13, 2011, FXI filed: (1) a complaint against the Debtor and AGI alleging claims for

6    relief including, *inter alia,* breach of contract, breach of the covenant of good faith and fair dealing,

7    breach of fiduciary duty to creditors as officer and director and breach of fiduciary duty to creditors as

8    debtor-in-possession (the "Adversary Action"); and (2) a motion for appointment of a receiver and a

9    preliminary injunction (the "Receiver Motion"). This Court denied FXI's application for an order

10   shortening time for the Receiver Motion, and the parties, after engaging in settlement negotiations,

11   stipulated to continue the hearing on the Receiver Motion from March 10, 2011 to April 21, 2011 to allow

12   the parties to attempt to reach a global settlement of their respective disputes.

13   On March 8, 2011, the Debtor filed the Motion for an Order Approving Compromise and

14   Controversy [Doc. No. 21], reflecting the original global settlement of the Parties' disputes. On March

15   18, 2011, the Debtor filed the Supplement to the Debtor's Motion for an Order Approving Compromise

16   and Controversy [Doc. No. 31]. On March 30, 2011, the Court entered an order approving the settlement

17   as amended by the supplement. Based on further due diligence and negotiations by the Parties, the Parties

18   have determined to enter into the new Compromise as set forth herein.

19   **C.    The Compromise.**

20   The Compromise resolves all disputes among the Parties. The following are material terms of the

21   Compromise.

22   Through the Retention Agreement, FXI will retain possession of its Collateral (as defined in the

23   Retention Agreement) and under the terms of the Proposal To Retain Collateral In Partial Satisfaction Of

24   Secured Obligation, dated May 6, 2011, a portion of AGI's debt to FXI will be satisfied. FXI, AGI and the

25   Debtor will grant each other the releases set forth in Section 4 of the Retention Agreement, including a

26   termination of the Debtor's guaranty of AGI's obligations to FXI. Through the Patent Purchase Agreement

27   and the assignment related thereto, the Debtor will sell certain patents (the "Patents") to FXI or its affiliate

28

1  in exchange for $100,000.  In addition, pursuant to a separate term sheet, FXI will, through two new,

2  wholly-owned entities (one a manufacturing entity and the other a sales one), purchase certain of AGI's

3  assets and assume certain of its liabilities.  The Debtor will become the CEO of the sales entity and will be

4  paid a salary, receive benefits and have the opportunity for an earn out based on performance.  Upon the

5  requested order becoming final and non-appealable, FXI will dismiss the Adversary Action with prejudice

6  and withdraw the Receiver Motion.

7       For the reasons set forth below, the Debtor requests that the Court approve the Compromise and

8  authorize the Debtor to enter into and implement the Retention Agreement and the Patent Purchase

9  Agreement.

10  **II.**

11  **THE COMPROMISE IS REASONABLE, FAIR AND**

12  **EQUITABLE AND IS IN THE BEST INTERESTS OF THE ESTATE**

13       The Debtor believes that the compromise is in the best interest of the estate and meets all of the

14  requirements of Fed. R. Bankr. P. 9019(a), which provides that:

15         On motion of the trustee and after notice and a hearing, the court may
16         approve a compromise or settlement.  Notice shall be given to creditors, the
           United States trustee, the debtor and indenture trustees as provided in Rule
17         2002 and to any other entity as the court may direct.

18  Fed. R. Bankr. P. 9019(a).

19       It is well established that the law favors compromise.  *In re A & C Properties*, 784 F.2d 1377, 1381

20  (9th Cir. 1986) ("The law favors compromise and not litigation for its own sake…"); *In re Michael*, 183

21  B.R. 230, 233 (Bankr.D.Mont. 1995) ("it is also well established that the law favors compromise") *citing In*

22  *re Blair*, 538 F.2d 849, 851 (9th Cir. 1976); *In re Stein*, 236 B.R. 34, 37 (D.Or. 1999) ("Pursuant to

23  Bankruptcy Rule 9019(a), compromises are favored in bankruptcy"); *In re Pierce Packing Co.*, 1994 WL

24  831374, *2 (Bankr.D.Mont. 1994) ("it is also well established that the law favors compromise").

25       The Ninth Circuit has recognized that "[t]he bankruptcy court has great latitude in approving

26  compromise agreements."  *A & C Properties*, 784 F.2d at 1380-81.  A bankruptcy court is not required to

27  decide the questions of law and fact raised in the controversies sought to be settled, nor is it required to

28

determine whether the settlement presented is the best one that could possibly have been achieved. Rather, it is sufficient that the settlement not fall "below the lowest point in the zone of reasonableness." *Newman v. Stein*, 464 F.2d 689, 698 (2nd Cir. 1972), *cert. denied*, 409 U.S. 1039 (1972). *See also, In re Milden*, 111 F.3d 138, 1997 WL 189302, *3 (9th Cir. 1997) (unpublished) ("Rather than conducting a detailed evaluation of the merits of the state court action, the bankruptcy court's function is to examine the proposed settlement to determine if it falls below the lowest point in the range of reasonableness.") (internal quotation marks omitted); *In re Schmitt*, 215 B.R. 417, 423 (9th Cir. BAP 1997) ("When assessing a compromise, courts need not rule upon disputed facts and questions of law, but rather only canvass the issues. A mini trial on the merits is not required.")

"[C]ourts need not conduct an independent investigation in formulating an opinion as to the reasonableness of a settlement; rather, they may give weight to the trustee's informed judgment that a compromise is fair and equitable and to the competency and experience of counsel who support the settlement." *In re Boyer*, 354 B.R. 14, 30 (Bankr.D.Conn. 2006); *In re International Distribution Centers, Inc.*, 103 B.R. 420, 423 (S.D.N.Y. 1989) *citing In re Blair*, 538 F.2d 849, 851 (9th Cir.1976).

"All that [the trustee] must do is establish to the reasonable satisfaction of [the Court] that, all things considered, it is prudent to eliminate the risks of litigation to achieve specific certainty though it might be considerably less (or more) than were the case fought to the bitter end." *In re Aloha Racing Foundation, Inc.*, 257 B.R. 83, 88 (Bankr. N.D. Ala. 2000); *In re Golden Mane Acquisitions, Inc.*, 221 B.R. 963, 966 (Bankr.N.D.Ala.1997) (*quoting Florida Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir.1960)).

The Trustee's burden "is not, however, a burden of proof regarding the underlying claim." *In re Key3Media Group, Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005). That is, the trustee burden "is not … a burden to prove or negate the underlying claim." *In re National Organization For Children, Inc.*, 2007 WL 1577753, 7 (Bankr. E.D. Pa. 2007).

The Ninth Circuit Court of Appeals has recognized that bankruptcy courts have wide discretion in approving compromise agreements. *See A & C Properties*, 784 F.2d at 1380-81. The Ninth Circuit has identified four factors that a bankruptcy court should consider in determining whether a proposed settlement is fair and equitable:

"(i) the probability of success in the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."

*Id.* (quoting *Lambert v. Flight Transp. Corp. (In re Flight Transp. Corp. Sec. Litigs.)*, 730 F.2d 1128, 1135 (8th Cir. 1984), *cert. denied*, 469 U.S. 1207 (1985)); *Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 620 (9th Cir. 1988).

Applying the four factors identified by the Ninth Circuit in determining whether a proposed compromise is fair and equitable, it is clear that the Compromise should be approved.

**A.      The Probability of Success on the Merits.**

The Debtor believes that he has certain valid defenses to the claims alleged in the Adversary Action and that this Court lacks subject matter jurisdiction to rule on the Receiver Motion. However, there is always uncertainty as to the outcome of litigation and the Debtor recognizes that there is significant risk in litigating the Adversary Action. The Compromise eliminates any inherent uncertainty as to the outcome and costs involved in litigating the Adversary Action. The Debtor has exercised his reasonable business judgment in determining that the Compromise benefits the estate by resolving various claims alleged in the Adversary Action and allowing for an efficient resolution of these claims. Thus, this part of the *A&C Properties* test favors Court approval of the Compromise.

**B.      Difficulty to Be Encountered in Collection.**

The Debtor is a defendant in the Adversary Action. Accordingly, the difficulty in the collection prong does not apply to the Compromise.

**C.      The Complexity, Expense and Inconvenience of Litigation.**

As described above, the Adversary Action presents issues that are complex and fact intensive. The Compromise provides an efficient, clear resolution among the Parties, which avoids the significant inconvenience and expense of litigating the respective rights and remedies available to the Parties. Pursuant to the Compromise, the Parties also release all claims against each other in the Debtor's case, further resolving complexity, expense and inconvenience of any future litigation. Accordingly, this part of the *A&C Properties* test favors court approval of the Compromise.

-8-

**D.**    **The Interest of the Debtor's Creditors.**

The Debtor believes that the Compromise substantially benefits the interests of the Debtor and his creditors. The estate will be diminished by the cost of litigating the Adversary Action, and as described below, the estate is benefited by Compromise in various ways.

The Compromise will remove uncertainty related to the Adversary Action and will minimize costs and expenses related to the disputes among the Parties by resolving all such disputes. Moreover, the Compromise will limit the Debtor's exposure to actual and potential claims. Among other things, the Retention Agreement provides for the release of FXI's claim against the estate, the amount and priority of FXI's claims against AGI and the Debtor and a termination of the Debtor's guaranty of AGI's obligations to FXI. Accordingly, the Compromise is beneficial to the Debtor's estate, will improve the financial condition of the Debtor and his estate, and will therefore benefit the Debtor's creditors. Therefore, upon application of the factors of the *A&C Properties* test, the Compromise is fair and equitable and should be approved by the Court.

**III.**

**THE DEBTOR HAS A REASONABLE BUSINESS**

**JUSTIFICATION FOR THE PATENT PURCHASE AGREEMENT**

**A.**    **Applicable Standard**

A trustee may sell all or substantially all of the estate's assets outside of the ordinary course under Section 363 prior to acceptance of, and outside of, a plan of reorganization. *See, Otto Preminger Films. Ltd. V. Quintex Entertainment, Inc. (In re Quintex Entertainment. Inc.)*, 950 F.2d 1492 (9th Cir. 1991) ("Section 363 of the Code allows a debtor to sell assets of the estate, after notice and a hearing, including a sale of substantially all the assets of the estate"); *Stephens Indus., Inc. v. McClung*, 780 F.2d 386, 389 (6th Cir. 1986); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

Before approving a proposed sale of all or substantially all the assets of a chapter 11 estate, courts require that the trustee articulate some business justification for the sale. *See, e.g., Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F. 26 1063, 1071 (2d Cir. 1983).

Further, Section 363 does not require that that the court substitute its business judgment for that of the trustee. *See e.g., In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 676 (Bankr. S.D.N.Y. 1989) (The Court will not substitute a hostile witness' business judgment for debtor's [business judgment] unless testimony "established that [the debtor] has failed to articulate a sound business justification for its chosen course"). Rather, the Court should ascertain whether the trustee has articulated a valid business justification for the proposed transaction. *See, e.g., Lewis v. Anderson*, 615 F.2d 778 (9th Cir. 1979), *cert. denied*, 449 U.S. 869, 101 S.Ct., 206 (1980). This is consistent with "the broad-authority to operate the business of the debtor . . . [which] indicates Congressional intent to limit court involvement in business decisions by a trustee . . . so that a court may not interfere with a reasonable business decision made in good faith by a trustee," *In re Airlift, Int'l, Inc.*, 18 B.R. 787, 789 (Bankr. S.D. Fla. 1982).

In determining whether a sale of all or substantially all of the assets of the estate satisfies the business purpose test, courts have required: (1) that there be a sound business reason for the sale; (2) that accurate and reasonable notice of the sale be given to interested persons; (3) that the sale yield an adequate price (i.e., one that is fair and reasonable); and (4) that the parties to the sale have acted in good faith. *Titusville Country Club. v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *see also, In re Walter*, 83 B.R. 14, 19-20 (Bankr. 9th Cir. 1988).

**B.      A Sound Business Justification Exists for the Sale**

The sale of the Patents is reasonable because it is part of an overall resolution of significant issues impacting the Debtor's chapter 11 case. Moreover, as the Patents relate to the Collateral that will be transferred being retained by FXI or one of its affiliates, they may not have significant value to other parties.

**C.      Adequate And Reasonable Notice Has Been Given Under The Circumstances**

All known creditors and other parties in interest were served with this Motion.

**D.      The Purchase Price for the Rights is Fair and Reasonable**

The adequacy of a purchase price is generally a function of whether the price was negotiated in good faith. *In re Apex Oil Co.*, 92 B.R. 847, 874 (Bankr. E.D. Mo. 1988) (holding that the consideration was adequate where it was negotiated in good faith); *In re Embrace Systems Corp.*, 178 B.R. 112, 123

1    (Bankr. W.D. Mich. 1995) (denying motion to sell where there was no evidence that the asset was

2    diligently or sufficiently marketed). The Debtor believes that $100,000 for the Patents is a fair and

3    reasonable price. Moreover, the Patents may not have significant value for parties other than FXI. This

4    purchase price was obtained through good-faith arms-length bargaining, without the need for an auction.

5        **E.**    **The Purchase Price for the Rights is Fair and Reasonable**

6        Although Section 363(b) does not explicitly require good faith, certain courts have also required

7    that a sale be made in good faith. *In re Ewell*, 958 F.2d 276, 281 (9th Cir. 1992). Here, the Patent

8    Purchase Agreement is proposed in good faith. Whether a proposed sale is in "good faith" focuses

9    principally on the element of special treatment of the debtor's insiders in the sale transaction. *Id; In re*

10   *Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa.

11   1987). There are no insider or secret dealings involved in the proposed sale process. Under the

12   circumstances, with no special treatment being provided to the purchaser, the proposed sale shall be a

13   good faith transaction.

14       **F.**    **The Purchaser Should Be Entitled to Good Faith Purchaser Status**

15       The Debtor requests that the Court find that FXI or its selected affiliate is a good faith purchaser

16   within the meaning of Section 363(m). The sale is to be made in an open and transparent manner. It

17   involves an arms' length transaction and all payments to be made are fully disclosed. The good faith

18   requirement under Section 363(m) focuses primarily on the disclosure of material sale terms and the

19   absence of fraud or collusion between the purchaser and other bidders or the trustee/debtor in possession.

20   *See, In re Abbotts Dairies of Pennsylvania. Inc.*, 788 F.2d 143,147 (3d Cir. 1986), citing *In re Rock Indus.*

21   *Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) and *Taylor v. Lake (In re Cada Invs.)*, 664 F.2d 1158,

22   1162 (9th Cir. 1981).

23       Section 363(m) provides, in pertinent part, that "[t]he reversal or modification on appeal of an

24   authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the

25   validity of a sale or lease under such authorization to an entity that purchased or leased ,such property in

26   good faith . . . ." 11 U.S.C. Section 363(m). Under Section 363(m), "an appeal of a bankruptcy court's

27   ruling on a foreclosure action [or sale] generally cannot affect the rights of a good faith purchaser of the

28

1   foreclosed property, unless the debtor [or other complaining party] stays the foreclosure [or other] sale

2   pending an appeal." *Mann v. Alexander Dawson, Inc. (In re Mann)*, 907 F.2d 923, 926 (9th Cir. 1990).

3   "[T]he primary goal of the mootness rule [embodied in Section 363(m)] 'is to protect the interest of a good

4   faith purchaser . . . of the property,' thereby assuring finality of sales." *Onouli-Kona Land Co. v. Estate of*

5   *Richards (In re Onouli-Kona Land Co.)*, 846 F.2d 1170, 1173 (9th Cir. 1988), quoting *Community Thrift &*

6   *Loan v. Suchy (In re Suchy)*, 786 F.2d 900, 901-02 (9th Cir. 1985).

7       Lack of good faith for purposes of Section 363(m) is generally determined by the existence of

8   fraudulent conduct during the sale process. *See, e.g., In re Exennium, Inc.*, 715 F.2d 1401 (9th Cir. 1983).

9   In this case, no such conduct has occurred.

10   **III.**

11   **CONCLUSION**

12       Based upon the foregoing, the Debtor respectfully requests that this Court enter its order

13   granting the relief requested herein.

14   DATED: May 9, 2011                **WINTHROP COUCHOT**

15                         **PROFESSIONAL CORPORATION**

16

17                         By:_____*/s/ Marc J. Winthrop*_____

18                             Marc J. Winthrop
                          Kavita Gupta

19                             General Insolvency Counsel
                          for Debtor and Debtor-in-Possession

20

21

22

23

24

25

26

27

28

## DECLARATION OF DAVID L. FARLEY

I, David L. Farley, hereby declare and state as follows:

1.      I am an individual and the debtor and debtor-in-possession herein (the "Debtor").[1] I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify thereto.

2.      I request that the Court approve the Compromise, including approval of (i) the Retention of Collateral and Release Agreement (the "Retention Agreement") by and among AGI, FXI and myself, and (ii) the Patent Purchase Agreement (the "Patent Purchase Agreement") among me and FXI or one of its affiliate. Unexecuted copies of the Retention Agreement and the Patent Purchase Agreement are attached hereto substantially in the form of Exhibit "1" and Exhibit "2," respectively. Executed versions of each will be filed within the next 10 – 14 days.

3.      I am the Chief Executive Officer and sole director and shareholder of Anatomic Global, Inc., a California corporation ("AGI"). My income is derived solely from compensation for my services to AGI. On January 21, 2011 (the "Petition Date"), I filed a voluntary Chapter 11 petition under Chapter 11 of the United States Bankruptcy Code. Since the Petition Date, I have continued to function as a debtor and debtor-in-possession.

4.      AGI is in the business of manufacturing foam mattresses and other sleep accessories. FXI is AGI's major supplier of foam products.  On May 18, 2010, AGI and FXI entered into a Loan and Security Agreement ("Prior Loan Agreement") pursuant to which FXI loaned AGI the principal amount of $4,539,937.32. AGI also executed an Amended and Restated Promissory Note (the "Amended and Restated Note") in favor of FXI.  In addition, I guaranteed the obligations of AGI to FXI (the "Guaranty"). On the same date, AGI entered into a Supply Agreement with FXI, pursuant to which AGI agreed to purchase 100% of its requirements for certain foam products from FXI, with certain limitations.

5.      AGI subsequently received a $2.5 million revolving line of credit from Celtic Capital Corporation ("Celtic").  On November 10, 2010, FXI entered into a Debt and Lien Subordination

---

[1] Capitalized terms used herein but not otherwise defined shall have the meaning set forth in the Motion.

-13-

1    Agreement with AGI and Celtic pursuant to which FXI agreed to subordinate its interest in AGI's collateral

2    other than inventory to the interests of Celtic ("Subordination Agreement"). On the same date, AGI and

3    FXI modified the Prior Loan Agreement by entering into an Amended and Restated Loan and Security

4    Agreement ("Amended Loan Agreement") and a First Amendment to the Amended and Restated

5    Promissory Note.

6          6.      In order to induce FXI to enter into the Subordination Agreement and as consideration for

7    the same, I entered into a pledge agreement pursuant to which I agreed to pledge my shares in AGI to secure

8    the Guaranty. In accordance with the pledge agreement, my shares in AGI are currently being held in

9    escrow by the Wilmington Trust Company and I was advised by my corporate counsel that a notice of

10   default was all that was required to allow FXI to exercise rights in the collateral.

11         7.      Based on FXI's assertion that AGI was in default of the Amended Loan Agreement, I was

12   concerned that FXI would attempt to seize my shares in AGI. Therefore, I filed my petition to prevent FXI

13   from exercising rights in my shares and to obtain a breathing spell within which to address the claims of all

14   creditors on a fair, equitable and uniform basis.

15         8.      On February 13, 2011, FXI filed: (1) a complaint against AGI and me alleging claims for

16   relief including, *inter alia,* breach of contract, breach of the covenant of good faith and fair dealing, breach

17   of fiduciary duty to creditors as officer and director and breach of fiduciary duty to creditors as

18   debtor-in-possession (the "Adversary Action"); and (2) a motion for appointment of a receiver and a

19   preliminary injunction (the "Receiver Motion"). This Court denied FXI's application for an order

20   shortening time for the Receiver Motion, and the parties, after engaging in settlement negotiations,

21   stipulated to continue the hearing on the Receiver Motion from March 10, 2011 to April 21, 2011 to allow

22   the parties to attempt to reach a global settlement of their respective disputes.

23         9.      On March 8, 2011, I filed the Motion for an Order Approving Compromise and Controversy

24   [Doc. No. 21], reflecting the original global settlement of the Parties' disputes. On March 18, 2011, I filed

25   the Supplement to the Debtor's Motion for an Order Approving Compromise and Controversy [Doc. No.

26   31]. On March 30, 2011, the Court entered an order approving the settlement as amended by the

27

28
                                        -14-

1    Supplement. Based on further due diligence and negotiations by the Parties, the Parties have determined to

2    enter into the new Compromise as described herein.

3        10.    The Compromise resolves all disputes among the Parties. The following are material terms

4    of the Compromise.[2]  Through the Retention Agreement, FXI will retain possession of its Collateral (as

5    defined in the Retention Agreement) and under the terms of the Proposal To Retain Collateral In Partial

6    Satisfaction Of Secured Obligation, dated May 6, 2011, a portion of AGI's debt to FXI will be satisfied.

7    FXI, AGI and I will grant each other the releases set forth in Section 4 of the Retention Agreement,

8    including a termination of my guaranty of AGI's obligations to FXI.  Through the Patent Purchase

9    Agreement and the assignment related thereto, I will sell certain patents (the "Patents") to FXI or its affiliate

10   in exchange for $100,000.  **Those Patents constitute a portion of the assets in my estate.**  In addition,

11   pursuant to a separate term sheet, FXI will, through two new, wholly-owned entities (one a manufacturing

12   entity and the other a sales one), purchase certain of AGI's assets and assume certain of its liabilities. I will

13   become the CEO of the sales entity and will be paid a salary, receive benefits and have the opportunity for

14   an earn out based on performance.  Upon the requested order becoming final and non-appealable, FXI will

15   dismiss the Adversary Action with prejudice and withdraw the Receiver Motion.

16       11.    The Patent Purchase Agreement was negotiated with FXI at arms-length and in good-faith. I

17   am not aware of any collusion or fraud in connection with the transactions contemplated by the Retention

18   Agreement or the Patent Purchase Agreement.  I believe that the $100,000 purchase price for the Patents is

19   fair and reasonable, and that an auction would not produce a higher or better price.

20       12.    I believe that I have certain valid defenses to the claims alleged in the Adversary Action and

21   that this Court lacks subject matter jurisdiction to rule on the Receiver Motion.  However, there is always

22   uncertainty as to the outcome of litigation and I recognize that there is significant risk in litigating the

23   Adversary Action. The Compromise eliminates any inherent uncertainty as to the outcome and costs

24

25   ------------------------------

26   [2] The foregoing is only intended to be a summary of the relevant terms of the Retention Agreement and the Patent
     Purchase Agreement for the benefit of the Court. The rights and duties of the Parties shall be governed by the
     respective agreements. In the event of any conflict between this summary and the terms of the Retention Agreement
27   and/or Patent Purchase Agreement, the terms of the actual Retention Agreement and/or Patent Purchase Agreement
     shall control.

28

-15-

1    involved in litigating the Adversary Action. I have exercised my reasonable business judgment in

2    determining that the Compromise benefits the estate by resolving various claims alleged in the Adversary

3    Action and allowing for an efficient resolution of these claims.

4          13.    I am a defendant in the Adversary Action. Accordingly, the difficulty in the collection prong

5    does not apply to the Compromise.

6          14.    The Adversary Action presents issues that are complex and fact intensive. The Compromise

7    provides an efficient, clear resolution among the Parties, which avoids the significant inconvenience and

8    expense of litigating the respective rights and remedies available to the Parties. Pursuant to the

9    Compromise, the Parties also release all claims against each other in my case, further resolving complexity,

10   expense and inconvenience of any future litigation.

11         15.    I believe that the Compromise substantially benefits the interests of my estate. The estate

12   will be diminished by the cost of litigating the Adversary Action, and as described below, the estate is

13   benefited by Compromise in various ways.

14         16.    The Compromise will remove uncertainty related to the Adversary Action and will

15   minimize costs and expenses related to the disputes among the Parties by resolving all such disputes.

16   Moreover, the Compromise will limit my exposure to actual and potential claims. Among other things,

17   the Retention Agreement provides for the release of FXI's claim against the estate. Accordingly, the

18   Compromise is beneficial to the estate, will improve financial condition of the estate and accordingly,

19   will therefore benefit my creditors.

20         I declare under penalty of perjury that the foregoing is true and correct.

21         Executed this 9th day of May 2011, at Chino Hills, California.

22

23                                      /s/ David L. Farley
                                        David L. Farley

24

25

26

27

28
                                                 -16-

# EXHIBIT "1"

## RETENTION OF COLLATERAL AND RELEASE AGREEMENT
### (UCC 9620)

**THIS RETENTION OF COLLATERAL AND RELEASE AGREEMENT** (this "Agreement") is entered into by and among **FXI, INC.**, a Delaware corporation formerly known as Foamex Innovations Operating Company ("Secured Party"), **ANATOMIC GLOBAL, INC.**, a California corporation ("Debtor"), and **DAVID L. FARLEY**, an individual ("Guarantor"), as of the date (the "Effective Date") set forth opposite Secured Party's signature on the signature pages hereto.

### RECITALS

A.    Debtor and Secured Party are parties to that certain Second Amended and Restated Loan Agreement, dated as of May 18, 2010 (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement").

B.    Debtor and Secured Party (as successor by assignment from Celtic Capital Corporation, a California corporation) are parties to that certain Loan and Security Agreement, dated as of November 3, 2010 (as amended, supplemented or otherwise modified from time to time, the "AR Loan Agreement"; together with the Loan Agreement, the "Credit Agreements").

C.    Pursuant to the Credit Agreements and otherwise, Debtor is indebted to Secured Party in an aggregate amount of not less than [$_____], which indebtedness is secured by substantially all of the assets of Debtor.

D.    Pursuant to the terms of the Loan Agreement, Guarantor executed and delivered that certain Continuing Guaranty, dated as of May 18, 2010, in favor of Secured Party, and pursuant to the terms of the AR Loan Agreement, Guarantor executed and delivered that certain Guaranty, dated November 3, 2010 (collectively, as amended, supplemented or modified from time to time, the Guaranties").

E.    One or more "Events of Default" under, and as defined in, each of the Credit Agreements has occurred and is continuing and, as a result thereof, among other things, Secured Party is entitled to accept the Collateral (as hereinafter defined) in partial satisfaction of the obligations owing by Debtor to Secured Party secured thereby (the "Secured Obligations").

F.    Pursuant to that certain Proposal To Retain Collateral In Partial Satisfaction Of Secured Obligation, dated _____, 2011 (the "Proposal"), from Secured Party to Debtor, Secured Party proposed that Secured Party accept all of the Collateral in partial satisfaction of the Secured Obligations, as provided for in Section 9620 of the California Uniform Commercial Code, and on _____, 2011, Debtor accepted the terms of the Proposal.

### AGREEMENT

NOW, THEREFORE, based upon the agreed upon facts set forth above, which are

incorporated herein, the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**1.    DEFINITIONS.** Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein. As used in this Agreement, the following terms shall have the following meanings:

"Accounts" means all of Debtor's now owned or hereafter acquired right, title, and interest with respect to "accounts" (as that term is defined in the Code), and any and all supporting obligations in respect thereof.

"Books" means Debtor's now owned or hereafter acquired books and records, including, without limitation, all of its records indicating, summarizing or evidencing its assets, liabilities, business operations and financial condition.

"Code" means the California Uniform Commercial Code, as in effect from time to time.

"Collateral" means all of the assets of (and any right, title and interest in and to any assets) Debtor that secure the obligations of Debtor owing to Secured Party and shall include, without limitation, the following:

(1)    with respect to the "Obligations" as defined in the Loan Agreement, all of Debtor's now owned or hereafter acquired right, title, and interest in and to each of the following:

        (a)    Accounts,

        (b)    Books,

        (c)    Equipment,

        (d)    General Intangibles,

        (e)    Inventory,

        (f)    Investment Property,

        (g)    Negotiable Collateral,

        (h)    Money or other assets of Debtor that now or hereafter come into the possession, custody, or control of Secured Party, and

        (i)    The proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all Accounts, Books, Equipment, General Intangibles, Inventory, Investment Property, Negotiable Collateral, money, deposit accounts, or other tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the

foregoing, or any portion thereof or interest therein, and the proceeds thereof.

(2)    with respect to the "Obligations" as defined in the AR Loan Agreement, all of Debtor's right, title and interest in and to the following, whether now owned or hereafter acquired, whether now or hereafter existing and wherever located, together with all collateral now or hereafter described in any UCC Financing Statement filed against Debtor naming Secured Party (or any predecessor in interest) as the secured party.

(a)    accounts; returned, reclaimed or repossessed goods, and rights as an unpaid vendor, with respect to accounts; contract rights; chattel paper; general intangibles (including tax and duty refunds, registered and unregistered patents, trademarks, service marks, copyrights, trade names and applications for the foregoing, trade secrets, goodwill, processes, drawings, blueprints, customer lists, software, licenses, whether as licensor or licensee, chooses in action and other claims, and existing and future leasehold interests in equipment and fixtures); money; documents; instruments, including promissory notes; letters of credit and letter of credit rights; and deposit accounts;

(b)    goods, including:

(i)    inventory, wherever located, including raw materials, work-in-process, finished goods, and all names or marks affixed or to be affixed thereto for purposes of selling the same by the seller, manufacturer, lessor or licensor thereof;

(ii)    equipment and fixtures, including motor vehicles, furniture, and any and all additions, substitutions, replacements (including spare parts) and accessions thereof and thereto and any and all software embedded therein; and

(iii)    goods in Debtor's possession, custody or control;

(c)    investment property;

(d)    books and records relating to any of the above, including all computer programs, printed output and computer-readable data in the possession or control of Debtor, any computer service bureau or any other third party;

(e)    claims of Debtor on any policy of insurance, including claims for premium refund under any workmen's compensation policy and claims under any business-interruption or similar coverage; and

(f)    products, proceeds and supporting obligations of the foregoing in whatever form and wherever located, including insurance proceeds, claims against third parties for loss or destruction of, or damage to, any of the foregoing, and income from the lease or rental of any of the foregoing.

Without limiting the generality of the foregoing, the Collateral includes, without limitation, all right, title and interest of Debtor in and to any claim against any person or entity (including, without limitation, Haynes Industries) arising out of the matters giving rise to Debtor's self-

23304921_V5.DOCX                    3

reporting to the Consumer Product Safety Commission regarding a potential fire safety hazard with 750 of Debtor's mattresses that were sold between May and October 2010.

"Equipment" means all of Debtor's now owned or hereafter acquired right, title, and interest with respect to equipment, machinery, machine tools, motors, furniture, furnishings, fixtures, vehicles (including motor vehicles), tools, parts, goods (other than consumer goods, farm products, or Inventory), wherever located, including all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing.

"General Intangibles" means all of Debtor's now owned or hereafter acquired right, title, and interest with respect to general intangibles (including payment intangibles, contract rights, rights to payment, rights arising under common law, statutes, or regulations, chooses or things in action, goodwill, patents, trade names, trademarks, service marks, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, rights to payment and other rights under any royalty or licensing agreements, infringement claims, computer programs, information contained on computer disks or tapes, software, literature, reports, catalogs, money, deposit accounts, insurance premium rebates, tax refunds, and tax return claims), and any and all supporting obligations in respect thereof, and any other personal property other than goods, Accounts, Investment Property, and Negotiable Collateral.

"Inventory" means all of Debtor's now or hereafter acquired right, title, and interest with respect to inventory, including goods held for sale or lease or to be furnished under a contract of service, goods that are leased by Debtor as lessor, goods that are furnished by Debtor under a contract of service, and raw materials, work in process, or materials used or consumed in Debtor's business.

"Investment Property" means all of Debtor's now owned or hereafter acquired right, title, and interest with respect to "investment property" as that term is defined in the Code, and any and all supporting obligations in respect thereof.

"Negotiable Collateral" means all of Debtor's now owned and hereafter acquired right, title, and interest with respect to letters of credit, letter of credit rights, instruments, promissory notes, drafts, documents, and chattel paper (including electronic chattel paper and tangible chattel paper), and any and all supporting obligations in respect thereof.

## 2.    ACKNOWLEDGMENTS OF DEBTOR AND GUARANTOR

2.1    Each of Debtor and Guarantor acknowledges that, as of _____, 2011, (a) Debtor is indebted to Secured Party under the Credit Agreements in an aggregate principal amount of not less than $_____ plus interest, costs, fees and expenses (the "Secured Obligations"), which Secured Obligations are currently due and payable in full without offset, deduction or counterclaim of any kind or character whatsoever, (b) Secured Party has been granted a security interest in the Collateral, (c) Events of Default have occurred and are continuing under the Credit Agreements and (d) Secured Party is entitled to immediately proceed to foreclose upon the Collateral and to exercise each of Secured Party's other rights and remedies set forth in the Credit Agreements and as provided by the Code.

2.2    Debtor and Guarantor each irrevocably:

(a)    consents to Secured Party retaining the Collateral in partial satisfaction of the Secured Obligations in accordance with the terms set forth herein and pursuant to the provisions of Section 9620 of the Code (it being expressly acknowledged that Debtor previously consented to Secured Party's acceptance of the Collateral in partial satisfaction of the Secured Obligations by its acceptance of the Proposal and such acceptance shall remain in full force and effect); and

(b)    waives and renounces any and all rights to notice it has or may have under Section 9601 et seq. of the Code or Part 6 of the Code including, without limitation, all rights under Section 9620 to receive notice of the proposed retention of the Collateral or subsequent disposition of same, or to the full extent of the law, any other notice or right they may have arising under or pursuant to this or any other section of the Code or otherwise.

2.3    Debtor and Guarantor each acknowledges that it does not have any claims, offsets, demands, damages, suits, assertions, cross-complaints, causes of action or debts of any kind or nature whatsoever, whether known or unknown, and whenever or howsoever arising (collectively referred to herein as "Existing Claims"), that can be asserted to reduce or eliminate Debtor's or Guarantor's obligation to repay the Secured Obligations or seek any affirmative relief or damages of any kind or nature from Secured Party, its officers, representatives, employees, counsel, assigns or successors. To the extent any such Existing Claims exist, they are fully, forever, and irrevocably waived and released by Debtor and Guarantors as more fully provided for in Section 4 hereof.

## 3.    SECURED PARTY'S ACCEPTANCE OF COLLATERAL IN PARTIAL SATISFACTION OF INDEBTEDNESS.

3.1    Pursuant to Section 9620 of the Code, this Agreement shall constitute the consent of Secured Party to its proposal to retain the Collateral in partial satisfaction of the Secured Obligations. This Agreement shall also constitute Debtor's and Guarantors' post default waiver and renunciation of all of their rights under Article 9, subdivision 6, of the Code (including, without limitation, Section 9620).

3.2    With effect on the Effective Date, Secured Party hereby accepts the Collateral in partial satisfaction of the Secured Obligations in the aggregate amount of _____ _____ Dollars ($_____), and such amount shall be credited against, and reduce the amount of, the Secured Obligations. Debtor and Guarantor acknowledge that the credit being received for the Collateral is fair and reasonable. Debtor and Guarantor acknowledge and agree that (a) Secured Party may, without notice to Debtor or Guarantor, assign to one or more person's or entities, Secured Party's right to take title to all or any portion of the Collateral in lieu of Secured Party, and (b) any such other person or entity so acquiring such title to the Collateral shall be deemed to have acquired such title as a result of Secured Party's acceptance of the Collateral pursuant hereto.

3.2    Debtor and Guarantors shall immediately assemble and make available to Secured Party for its immediate possession the Collateral and all items relating thereto including, but not limited to, computer disks, records as to the Collateral, contracts, books and records and other information that may be of assistance to Secured Party in its management of the Collateral.

## 4. RELEASE OF CLAIMS.

4.1    <u>Release By Debtor and Guarantor</u>. Each of Debtor and Guarantor, for itself and each of its predecessors, successors, assigns, representatives, attorneys, agents, affiliates, and any other person or entity who may in any fashion claim any interest in the subject matter hereof by, through or on behalf of Debtor or Guarantor (collectively, the "<u>Debtor Related Parties</u>"), as of the Effective Date, hereby forever, fully and irrevocably releases Secured Party and its each of its subsidiaries, affiliated entities and predecessors, successors, assigns, heirs, legatees, and past and present shareholders, directors, officers, partners, members, affiliates, employees, agents, attorneys and representatives (collectively, the "<u>Secured Party Released Parties</u>") from any and all liabilities, claims, demands, controversies, damages, debts, obligations, and causes of action of every kind and nature (including, without limitation, claims for punitive damages, compensatory damages, restitution, disgorgement, injunctive relief or specific performance, costs, expenses, and attorneys', brokers' and accountants' fees and expenses, or any other similar or dissimilar claim), whether known or unknown, suspected or unsuspected, in law or in equity, under any legal or equitable theory, common law, statutory or otherwise (including, without limitation, negligent, intentional or fraudulent acts or omissions or the breach of any duty, agreement or obligation in any jurisdiction, or any other similar or dissimilar theory) to the extent relating to agreements made or actions, events or circumstances occurring or failing to occur, in the period on or before the Effective Date, including but not limited to any of the foregoing that arise under or relate to the Credit Agreements or otherwise, but expressly excluding any of the foregoing arising out of a breach of this Agreement or any obligations arising under this Agreement (collectively, the "<u>Debtor Released Claims</u>"). The Debtor Related Parties hereby irrevocably agree to refrain during the period from and after the Effective Date from directly or indirectly asserting or advancing any claim or demand or commencing (or causing to be commenced) any suit, action, or proceeding of any kind, in any court or before any tribunal, against any Secured Party Released Party based upon any Debtor Released Claim.

4.2    <u>Release By Secured Party Guarantor</u>. Secured Party, for itself and each of its predecessors, successors, assigns, representatives, attorneys, agents, affiliates, and any other person or entity who may in any fashion claim any interest in the subject matter hereof by, through or on behalf of Secured Party (collectively, the "<u>Secured Party Related Parties</u>"), as of the Effective Date, hereby forever, fully and irrevocably releases Guarantor from any and all liabilities, claims, demands, controversies, damages, debts, obligations, and causes of action of every kind and nature arising under the Guaranties (including, without limitation, claims for punitive damages, compensatory damages, restitution, disgorgement, injunctive relief or specific performance, costs, expenses, and attorneys', brokers' and accountants' fees and expenses, or any other similar or dissimilar claim), whether known or unknown, suspected or unsuspected, in law or in equity, under any legal or equitable theory, common law, statutory or otherwise (including, without limitation, negligent, intentional or fraudulent acts or omissions or the breach of any duty, agreement or obligation in any jurisdiction, or any other similar or dissimilar theory)

to the extent relating to agreements made or actions, events or circumstances occurring or failing to occur, in the period on or before the Effective Date, but expressly excluding any of the foregoing arising out of a breach of this Agreement or any obligations arising under this Agreement or to the extent not arising under the Guaranties (collectively, the "Secured Party Released Claims"). The Secured Party hereby irrevocably agree to refrain during the period from and after the Effective Date from directly or indirectly asserting or advancing any claim or demand or commencing (or causing to be commenced) any suit, action, or proceeding of any kind, in any court or before any tribunal, against the Guarantor based upon any Secured Party Released Claim.

4.3    Release of Unknown Claims. Each of Debtor, Guarantor and Secured Party acknowledges that it is aware that statutes exist that render null and void or otherwise affect releases and discharges of any claims, rights, demands, liabilities, actions and causes of action which are unknown to the releasing or discharging party at the time of execution of the release and discharge. Each of Debtor, Guarantor and Secured party, as of the Effective Date, hereby expressly waive, surrender and agree to forego any protection, rights or benefits to which it otherwise would be entitled by virtue of the existence of any such statute in any jurisdiction including, but not limited to, the provisions of Section 1542 of the California Civil Code, which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER, MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

The parties hereto each acknowledge that they may hereafter discover facts different from, or in addition to, those that they now believe to be true, with respect to all or any of the liabilities, claims, demands and causes of action herein released. Nevertheless, the parties hereto each agree that the releases set forth above shall be and remain effective in all respects, notwithstanding the discovery of such different or additional facts.

4.4    No Prior Transfer of Claims. Debtor and Guarantor, and each of them, hereby warrant and represent to Secured Party, as to any released Debtor Released Claim, each of them is the sole and absolute owner thereof, free and clear of all of the rights and interest of any other person therein and has the right, ability and sole power to release such released Debtor Released Claim.

## 5.    MISCELLANEOUS.

5.1    Effectiveness. This Agreement shall be effective upon the Effective Date; provided, however, that Debtor shall be deemed to have irrevocably accepted, and consented to, the terms and conditions hereof, upon the execution and delivery hereof by Debtor.

5.2    Costs of Enforcement. Whether or not litigation is necessary to enforce any of the provisions of this Agreement (including, without limitation, the securing of any relief from any

provision of the U.S. Bankruptcy Code or incurred in any manner in connection with a bankruptcy proceeding of Debtor or Guarantor (each, an "Insolvency Proceeding"), the prevailing party shall recover from the non-prevailing party(ies) all reasonable costs, expenses and attorneys' fees incurred in connection with pursuing any rights hereunder or under the Credit Agreements, including, without limitation, attorneys' fees incurred in connection with (a) relief from stay or any similar or other proceedings in any Insolvency Proceeding, (b) any appeals, (c) the enforcement of any judgment, and (d) the appointment of any receiver in connection with Secured Party's pursuit of its rights and remedies, which appointment Debtor and Guarantor hereby consent to.

5.3   Further Assurances. Debtor and Guarantor agree to execute such other documents and instruments and perform such other acts as may necessary or requested by Secured Party to carry out and effectuate the purpose and intent of this Agreement.

5.4   Integration. This Agreement and all documents and exhibits referred to herein and/or attached hereto, constitute the complete agreement of the parties hereto with respect to the subject matters referred to herein and supersede all prior or contemporaneous negotiations, promises, covenants, agreements or representations of every kind or nature whatsoever with respect thereto, all of which have become merged and finally integrated into this Agreement. Each of the parties understands that in the event of any subsequent litigation, controversy or dispute concerning any terms, conditions or provisions of this Agreement, neither party shall be permitted to offer or introduce any oral evidence concerning any other oral promises or oral promises or oral agreements between the parties relating to the subject matters of this Agreement not included or referred to herein and not reflected by a writing. This Agreement cannot be amended, modified, or supplemented except by a written document signed by all parties hereto.

5.5   Rules of Construction. The Article and Section headings in this Agreement are inserted only as a matter of convenience, and in no way define, limit, extend or interpret the scope of this Agreement or of any particular Article or Section.

5.6   Severability. If any provision of this Agreement shall be found by a court to be invalid or unenforceable, in whole or in part, then such provision shall be construed and/or modified or restricted to the extent and in the manner necessary to render the same valid and enforceable to the extent possible, or, if not so possible, shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, or as if such provision had not been originally incorporated herein, as the case may be. The parties further agree to seek a lawful substitute for any provision found to be unlawful; provided that if the parties are unable to agree upon a lawful substitute, the parties desire and request that a court or other authority called upon to decide the enforceability of this Agreement modify this Agreement so that, once modified, the Agreement will be enforceable to the maximum extent permitted by the laws in existence at the time of the requested enforcement.

5.7   Agreement Negotiated. The parties hereto are sophisticated and have been represented by counsel throughout this transaction who have carefully negotiated the provisions hereof. As a consequence, the parties agree that the presumptions of Section 1654 of the

California Civil Code relating to the interpretation of contracts against the drafter of any particular clause should not be applied in this case and therefore waive its effects.

5.8    Notices. All notices, requests and demands required to be given hereunder, shall be in writing and shall given in accordance with the Credit Agreements.

5.9    No Assignment; Binding Effect. This Agreement may be assigned by Secured Party in whole or in part in its sole and absolute discretion. This Agreement is personal to Debtor and Guarantor and shall not be assigned by any of them to any other person or entity and any such assignment shall be in violation hereof and null and void. Notwithstanding the above, this Agreement shall be binding upon and shall inure to the benefit of the respective parties hereto and their respective heirs, estates and successors, and the assigns of Secured Party.

5.10    Recitals Incorporated. The Recitals are incorporated into and are a part of this Agreement.

5.11    Counterparts; Electronic Execution. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.  Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic means shall be equally as effective as delivery of a manually executed counterpart. Any party hereto delivering an executed counterpart hereof by telefacsimile shall also deliver a manually executed counterpart, but the failure to so deliver a manually executed counterpart shall not affect the validity, enforceability or binding effect hereof.

5.12    No Joint Venture. The parties hereto are debtor and creditor, no fiduciary duty or relationship exists between them and the parties are not engaging in a joint venture.

5.13    Survival of Representations of Warranties, etc. Debtor and Guarantor, and each of them, represent and warrant and acknowledge that: (i) Secured Party is relying upon the representations and warranties, all of which shall survive the execution hereof; (ii) the execution, delivery and performance of this Agreement has been duly authorized by Debtor and Guarantor; and (iii) this Agreement, when executed and delivered, constitutes the valid, binding and legally enforceable obligation of Debtor and Guarantor in accordance with the terms hereof.

5.14    Confidentiality. The terms of this Agreement have been negotiated and received in confidence and, except as otherwise set forth herein, neither the Secured Party, the Debtor, nor the Guarantor, nor any of them, their representatives, employees or those acting on their behalf, will disclose any of the terms of this Agreement, or authorize anyone else to disclose such terms, without the express written consent of the other parties, except that the parties may disclose the terms of this Agreement to their attorneys, accountants, auditors and financial advisors, and as required by law.

5.15    GOVERNING LAW, VENUE, JURISDICTION; JURY TRIAL WAIVER.

(a)    THE    VALIDITY    OF    THIS    AGREEMENT,    ITS    CONSTRUCTION,

INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR RELATED HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REFERENCE TO THE CONFLICT OF LAW PRINCIPLES THEREOF.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTIES OF LOS ANGELES OR RIVERSIDE, STATE OF CALIFORNIA, OR AT THE SOLE OPTION OF SECURED PARTY, IN ANY OTHER COURT IN WHICH SECURED PARTY SHALL INITIATE LEGAL OR EQUITABLE PROCEEDINGS AND WHICH HAS SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. EACH OF THE PARTIES HERETO WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.

(c)    TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH OF DEBTOR AND GUARANTOR WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, IN EACH CASE, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT OR TORT OR OTHERWISE. EACH OF DEBTOR AND GUARANTOR ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY SECURED PARTY THAT THE PROVISIONS OF THIS SECTION CONSTITUTE A MATERIAL INDUCEMENT UPON WHICH SECURED PARTY PARTY HAS RELIED IN ENTERING INTO THIS AGREEMENT. ANY PERSON MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF DEBTOR AND GUARANTOR TO THE WAIVER OF ITS RIGHTS TO TRIAL BY JURY.

(d)    TO THE EXTENT A PREDISPUTE WAIVER OF THE RIGHT TO TRIAL BY JURY IS NOT ENFORCEABLE UNDER APPLICABLE LAW, ANY AND ALL DISPUTES, CONTROVERSIES OR CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING, WITHOUT LIMITATION, THE MAKING, PERFORMANCE, OR INTERPRETATION OF THIS AGREEMENT AND INCLUDING WITHOUT LIMITATION CONTRACT AND TORT DISPUTES, SHALL BE HEARD BY A REFEREE AND RESOLVED BY JUDICIAL REFERENCE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE §638. THE REFEREE SHALL BE AN ATTORNEY LICENSED TO PRACTICE LAW IN THE STATE OF CALIFORNIA AND EXPERIENCED AND QUALIFIED IN FINANCIAL MATTERS OF THE TYPE CONTEMPLATED BY THIS AGREEMENT AND THE CREDIT AGREEMENTS OR A RETIRED CALIFORNIA SUPERIOR OR APPELLATE COURT JUDGE. THE PARTIES SHALL NOT SEEK TO APPOINT A REFEREE THAT MAY BE DISQUALIFIED

PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE §641 or §641.2 WITHOUT THE PRIOR WRITTEN CONSENT OF ALL PARTIES.  IF THE PARTIES ARE UNABLE TO AGREE UPON A REFEREE WITHIN TEN (10) CALENDAR DAYS AFTER ONE PARTY SERVES A WRITTEN NOTICE OF INTENT FOR JUDICIAL REFERENCE ON THE OTHER PARTY OR PARTIES, THEN THE REFEREE WILL BE SELECTED BY THE COURT IN ACCORDANCE WITH CALIFORNIA CODE OF CIVIL PROCEDURE §640(b). ANY DECISION OF THE REFEREE SHALL BE ENTERED AS A JUDGMENT IN THE COURT IN ACCORDANCE WITH CALIFORNIA CODE OF CIVIL PROCEDURE §§644 and 645.

[Remainder of page intentionally left blank.]

**IN WITNESS WHEREOF**, this Retention of Collateral and Release Agreement is entered into by the parties as of the day and year first above written.

Date: _____        "DEBTOR":

                                    ANATOMIC GLOBAL, INC.
                                    a California corporation

                                    By: _____
                                    Name:
                                    Title:

Date: _____        "GUARANTOR":

                                    _____
                                    David L. Farley, an individual

Date: _____        "SECURED PARTY":
      ("Effective Date")

                                    FXI, INC.
                                    a Delaware corporation formerly known as Foamex
                                    Innovations Operating Company

                                    By: _____
                                    Name:
                                    Title:

# EXHIBIT "2"

## PATENT PURCHASE AGREEMENT

**THIS PATENT PURCHASE AGREEMENT** (this "**Agreement**"), made and entered into on this __ day of _____, 2011, is by and among [Anatomic Innovations], a _ _____ ("**Purchaser**") and David L. Farley, an individual ("**Seller**").

## W I T N E S S E T H:

**WHEREAS,** Seller owns certain patents and patent applications; and

**WHEREAS** Purchaser desires to acquire from Seller, and Seller desires to sell to Purchasers, such patents and patent applications, in each case, on the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing premises and of the mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF PATENTS; PURCHASE PRICE

Section 1.1    Purchase of Patents.  On the Closing Date (as defined herein), Seller shall sell, convey, assign, deliver and transfer to Purchaser, and Purchaser shall buy and take possession of, all right, title and interest in and to all of the Patents (as defined herein), free and clear of all security interests, liens, claims, and other encumbrances.  The "**Patents**" shall mean, and consist of, all right title and interest in and to following:  (a) all issued patents and pending patent applications, including, without limitation, divisionals, continuation, continuation in part, continuing and renewal applications, in each case, identified on Schedule 1.1 hereto, which Schedule 1.1 is incorporated herein by this reference; (b) all right to sue for past infringement of such patents and patent applications, and all future royalty payments and other compensation payable with respect to such patents and patent applications; and (c) all documents, files, and other materials, regardless of form (e.g., written documentation, magnetic media and optical media), that in any way relate to or concern the foregoing.

Section 1.2    Purchase Price.

(a)    The total consideration to be paid to Seller for the Patents shall be $100,000 (the "**Purchase Price**"), payable at Closing to Seller by wire transfer of immediately available funds.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

Each of Purchaser and Seller represents and warrants, solely as to itself, that: (a) the execution, delivery and performance of this Agreement have been duly authorized by it; and (b) this Agreement, when executed and delivered, constitutes the valid, binding and legally enforceable obligation of it in accordance with the terms hereof.  Seller further represents and

warrants to Purchaser that Seller has good and marketable title to the Patents, free and clear of all security interests, liens, claims, and other encumbrances.

## ARTICLE III
## CLOSING

Section 3.1    Closing Deliveries of Seller.   Simultaneously with the execution and delivery of this Agreement, Seller shall execute and deliver to the Purchaser (or its assignee), an assignment of patents, in form and substance satisfactory to Purchaser, with respect to the Patents (the "**Patent Assignment**").

Section 3.2    Purchaser's Closing Deliveries.   Simultaneously with the execution and delivery of this Agreement, the Purchaser shall deliver to Seller, the Purchase Price by wire transfer as required by Section 1.2.

Section 3.3    Closing; Closing Date.   "Closing Date" means the date first written above upon which this Agreement will be executed and effective.   "Closing" means the simultaneous occurrence of Seller executing and delivering the Patent Assignment to Purchaser (or its assignee) and Purchaser paying to Seller the Purchase Price.

## ARTICLE IV
## MISCELLANEOUS

Section 4.1    Entire Agreement; Amendment.   This Agreement and the Patent Assignment contain the entire agreement of the parties hereto with respect to the transactions described herein and therein, and no representation, warranty, inducement, agreement, promise or understanding which alters, modifies, limits or adds to the terms or conditions of this Agreement or the Patent Assignment shall have any force or effect unless the same is in writing and executed by the parties hereto.

Section 4.2    Assignment.   This Agreement shall inure to the benefit of, and be binding upon and enforceable by, the parties hereto and their respective successors and permitted assigns. Seller shall not assign or delegate, in whole or in part, any of its rights or obligations under this Agreement without the prior written consent of Purchaser, which consent shall be in Purchaser's sole discretion.   Any assignment or delegation, or attempted assignment or delegation, in violation of this Section 5.2 shall be void *ab initio*.   Purchaser may, without the consent of Seller, assign or delegate its rights and obligations in, to and under this Agreement in whole or in part to any one or more persons or entities.   Purchaser hereby advises Seller that Purchaser has assigned the right to take title to the Patents to FXI, Inc., a Delaware corporation ("**FXI**"), and Seller hereby acknowledges and consents to such assignment.

Section 4.3    Further Assurances.   Seller shall execute and deliver such instruments and documents as the Purchaser (or its assignee) may request in order to better sell, convey, transfer, assign to the Purchaser (or its assignee), or to better perfect or record the Purchaser's (or its assignee's) interest in or title to, or to enable the Purchaser (or its assignee) to better use, the Patents, or otherwise carry out the purposes and intent of this Agreement or the Patent Assignment.

Section 4.4    Notices.  All notices, requests, demands, waivers, consents, approvals, payments or other communications which are required by or permitted hereunder shall be in writing and be deemed delivered (a) upon receipt, if by hand delivery, (b) upon transmission, if sent by facsimile with confirmation of receipt during normal business hours for the recipient or on the next business day if sent after normal business hours for the recipient, (c) the next day, if sent by a reputable overnight courier service such as FedEx, or (d) on the fifth day following deposit in the United States mail, certified, postage prepaid, return receipt requested addressed as follows:

| | |
|---|---|
| If to the Purchaser: | c/o FXI, Inc. |
| | Rose Tree Corporate Center II |
| | 1400 N. Providence Road, Suite 2000 |
| | Media, PA 19063 |
| | Attn:  Chief Financial Officer |
| | Facsimile:  (610) 744-2119 |
| With a copy to: | FXI, Inc. |
| | Rose Tree Corporate Center II |
| | 1400 N. Providence Road, Suite 2000 |
| | Media, PA 19063 |
| | Attn:  General Counsel |
| | Facsimile:  (610) 744-2118 |
| If to Seller: | David L. Farley |
| | _____ |
| | _____ |
| | _____ |
| | Facsimile:_____ |
| With a copy to: | _____ |
| | _____ |
| | _____ |
| | Attn: _____ |
| | Facsimile: _____ |

Any party may change its address for receiving notice by giving notice of such new address in the manner provided herein.  Notice given to counsel for any party shall not be deemed to be notice given to such party for any purposes hereunder whatsoever.

Section 4.5    Indulgences, etc.  Neither the failure nor any delay on the part of either party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or future exercise of the same or any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence.  The provisions of this Agreement are independent of and several from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.

Section 4.6    Headings; Gender.    The section headings in this Agreement are for convenience only, they form no part of this Agreement and shall not affect its interpretation. Words used herein regardless of the number and gender specifically used shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

Section 4.7    GOVERNING LAW, VENUE, JURISDICTION; JURY TRIAL WAIVER.

(a) THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR RELATED HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REFERENCE TO THE CONFLICT OF LAW PRINCIPLES THEREOF.

(b) THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTIES OF LOS ANGELES OR RIVERSIDE, STATE OF CALIFORNIA. EACH OF THE PARTIES HERETO WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.

(c) TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH OF THE PARTIES HERETO WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, IN EACH CASE, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT OR TORT OR OTHERWISE. EACH OF THE PARTIES HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER THAT THE PROVISIONS OF THIS SECTION CONSTITUTE A MATERIAL INDUCEMENT UPON WHICH SUCH OTHER PARTY HAS RELIED IN ENTERING INTO THIS AGREEMENT. ANY PERSON MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH PARTY HERETO TO THE WAIVER OF ITS RIGHTS TO TRIAL BY JURY.

(d) TO THE EXTENT A PREDISPUTE WAIVER OF THE RIGHT TO TRIAL BY JURY IS NOT ENFORCEABLE UNDER APPLICABLE LAW, ANY AND ALL DISPUTES, CONTROVERSIES OR CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING, WITHOUT LIMITATION, THE MAKING, PERFORMANCE, OR INTERPRETATION OF THIS AGREEMENT AND INCLUDING WITHOUT LIMITATION CONTRACT AND TORT DISPUTES, SHALL BE HEARD BY A REFEREE AND RESOLVED BY JUDICIAL

23305260_V4.DOC                                        4

REFERENCE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE §638. THE REFEREE SHALL BE AN ATTORNEY LICENSED TO PRACTICE LAW IN THE STATE OF CALIFORNIA AND EXPERIENCED AND QUALIFIED IN MATTERS OF THE TYPE CONTEMPLATED BY THIS AGREEMENT OR A RETIRED CALIFORNIA SUPERIOR OR APPELLATE COURT JUDGE. THE PARTIES SHALL NOT SEEK TO APPOINT A REFEREE THAT MAY BE DISQUALIFIED PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE §641 or §641.2 WITHOUT THE PRIOR WRITTEN CONSENT OF ALL PARTIES. IF THE PARTIES ARE UNABLE TO AGREE UPON A REFEREE WITHIN TEN (10) CALENDAR DAYS AFTER ONE PARTY SERVES A WRITTEN NOTICE OF INTENT FOR JUDICIAL REFERENCE ON THE OTHER PARTY OR PARTIES, THEN THE REFEREE WILL BE SELECTED BY THE COURT IN ACCORDANCE WITH CALIFORNIA CODE OF CIVIL PROCEDURE §640(b). ANY DECISION OF THE REFEREE SHALL BE ENTERED AS A JUDGMENT IN THE COURT IN ACCORDANCE WITH CALIFORNIA CODE OF CIVIL PROCEDURE §§644 and 645.

Section 4.8    Counterparts; Electronic Execution. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic means shall be equally as effective as delivery of a manually executed counterpart. Any party hereto delivering an executed counterpart hereof by telefacsimile shall also deliver a manually executed counterpart, but the failure to so deliver a manually executed counterpart shall not affect the validity, enforceability or binding effect hereof.

**[SIGNATURES APPEAR ON THE NEXT PAGE]**

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Patent Purchase Agreement on the date first above written.

_____

David L. Farley, an individual

_____,

a _____

By: _____
Name:
Title:

34

<u>SCHEDULE 1.1</u>
<u>PATENTS</u>

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **DEBTOR'S MOTION FOR AN ORDER APPROVING COMPROMISE OF CONTROVERSY AND SALE OF CERTAIN PATENTS; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID L. FARLEY IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On May 9, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Richard J Bauer    rbauer@mileslegal.com
- Marc S Cohen    mcohen@kayescholer.com
- Ashleigh A Danker    adanker@kayescholer.com
- Todd S Garan    ecfcacb@piteduncan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Elizabeth A Lossing    elizabeth.lossing@usdoj.gov
- Ramesh Singh    claims@recoverycorp.com
- United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On May 9, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**Via U.S. Mail**
Honorable Deborah J. Saltzman
3420 Twelfth St., Suite 384
Riverside, CA 92501-3819

☒ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| May 9, 2011 | Viann Corbin | /s/ Viann Corbin |
| Date | Type Name | Signature |

-17-

## SERVICE VIA FIRST CLASS MAIL

David Farley
2891 Venezia Terrace
Chino Hills, CA 91709-6603

Office of the U.S. Trustee
Elizabeth Lossing, Esq.
3685 Main Street, Suite 300
Riverside, CA 92501

Farley MML all creditors
Document No. 157850

AAA
Attn: Corporate Officer
P.O. Box 15026
Wilmington, DE 19850-5026

Chase
Attn: Corporate Officer
P.O. Box 15298
Wilmington, DE 19850-5298

Internal Revenue Special Procedures
Special Procedures'
24000 Avila Road
Laguna Niguel, CA 92677

AT&T
Attn: Corporate Officer
P.O. Box 6500
Sioux Falls, SD 57117-6500

Citibank
Attn: Corporate Officer
Box 6000
The Lakes, NV 89163-6000

Riverside County Tax Coll
4080 Lemon Street
P.O. Box 12005
Riverside, CA 92501-3660

Bank of America
Attn: Corporate Officer
P.O. Box 5170
Simi Valley, CA 93062-5170

Franchise Tax Board
Attn: Bankruptcy
PO Box 2952
Sacramento, CA 95812-2952

San Bernardino County Tax Coll.
172 West Third St.
San Bernardino, CA 92415

Celtic Capital Corporation
Attn: Corporate Officer
2951 28th St., #2030
Santa Monica, CA 90405

FXi Foamex Innovations
Attn: Corporate Officer
Rose Tree Corp Ctr II, #2000
Media, PA 19063-2076

Sears
Attn: Corporate Officer
P.O. Box 6283
Sioux Falls, SD 57117-6283

Chase
Attn: Corporate Officer
PO Box 9001123
Louisville, KY 40290-1123

Wells Fargo Bank
Attn: Corporate Officer
P.O. Box 10347
Des Moines, IA 50306-0347

2/7/11 NEF

Richard J. Bauer, Jr., Esq.
Milles, Bauer, Bergstrom & Winters,
LLC

NEF RSN 2/25/11

W/Sch

Laura A. Castro
376 South Olive Street
Orange, CA 92866

Foamex Innovatiom Operating Cmpany
c/o Kaye Scholer LLP
Marc S. Cohen, Esq.
1999 Ave. of Start, #1700
Los Angeles, CA 90067

RSN 2/25/11

Foamex Innovatiom Operating Cmpany
Cozen O'Connor
Arthur J. Abramowitz, Esq.
1900 Market Street
Philadelphia, PA 19103

NEF 3/9/11

Recovery Management Systems
Corp.
Attn: Ramesh Singh

NEF 3/28/11

Todd S. Garan
Pite Duncan, LLP
4375 Jutland Dr.,
San Diego, CA 92117

RSN4/7/2011

Ascension Capital Group, Inc.
Attn: BMW Financial Serv. NA, LLC Dept.
Acct: xxxxxxxxxxxx6142
PO Box 201347
Arlington, TX 76006

REF 5/6/11

Duane Kumagai, Esq.
Rutter Hobbs & Davidoff, Inc.
1901 Ave. of Start, #1700
Los Angeles, CA 90067