1 | Robert P. Goe - State Bar No. 137019
Elizabeth A. LaRocque - State Bar No. 219977
2 | **GOE & FORSYTHE, LLP**
18101 Von Karman Avenue, Suite 510
3 | Irvine, CA 92612
Telephone: (949) 798-2460
4 | Facsimile: (949) 955-9437
Email: rgoe@goeforlaw.com
5 |     elarocque@goeforlaw.com

6 | Proposed Attorneys for Debtor and
Debtor-in-Possession, David L. Farley
7 |

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | **RIVERSIDE DIVISION**

11 | In re:

12 |

13 | DAVID L. FARLEY,

14 |
           Debtor and
15 |        Debtor-in-Possession.

16 |

17 |

18 |

19 |

20 |

21 |

22 |

| Case No. 6:11-bk-12031- DS |
| Chapter 11 Proceeding |
| **DEBTOR'S NOTICE OF MOTION AND MOTION FOR AN ORDER APPROVING COMPROMISE OF CONTROVERSY; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID L. FARLEY IN SUPPORT THEREOF** |
| [Bankruptcy Code Section Fed. R. Bankr. P. 9019] |
| DATE: March 29, 2012 |
| TIME: 1:00 p.m. |
| PLACE: Courtroom 304 |
|        3420 Twelfth Street |
|        Riverside, CA 92501 |

23 | **TO THE HONORABLE DEBORAH J. SALTZMAN, UNITED STATES**

24 | **BANKRUPTCY JUDGE, ALL CREDITORS, THE UNITED STATES TRUSTEE, AND**

25 | **OTHER PARTIES IN INTEREST:**

26 | **PLEASE TAKE NOTICE** that pursuant to Federal Rule of Bankruptcy Procedure 9019

27 | ("Rule 9019"), David L. Farley, the debtor and debtor-in-possession herein ("Debtor"), hereby moves

28 | ("Motion") the Court for an order approving the Separation and Release Agreement (the "Separation

1  Agreement") dated as of March 8, 2012 among the Debtor, Anatomic Holdings, Inc. (the "Company"),

2  and FXI, Inc. (formerly known as Foamex Innovations Operating Company) d/b/a FXI ("FXI"). This

3  Motion is brought pursuant to Rule 9019 to the extent that the Separation Agreement represents a

4  compromise of potential claims, if any, related to the termination of the Debtor's employment pursuant

5  to the Employment Agreement dated May 27, 2011 (the "Employment Agreement"). The Separation

6  Agreement includes full mutual releases, with limited carve outs, and waivers of unknown claims.

7  Executed copies of the Separation Agreement and the Employment Agreement are attached as

8  **Exhibits "A"** and **"B",** respectively, to the Declaration of David L. Farley attached hereto ("Farley

9  Declaration").

10  The Debtor, the Company, and FXI are collectively referred to herein as the "Parties."

11  Except as otherwise expressly provided in the Separation Agreement, the Separation Agreement

12  resolves all claims between the Parties.  Good cause exists for granting the Motion.  As set forth in the

13  Farley Declaration, the terms of the Separation Agreement are fair and reasonable and in the best

14  interests of the Debtor, his estate, and his creditors.  This Motion is made and based on the

15  Memorandum of Points and Authorities and the Farley Declaration attached hereto, all pleadings,

16  papers and other documents on file with the Court and such other evidence, both oral and

17  documentary, as may be presented to the Court with respect to the Motion.

18  **PLEASE TAKE FURTHER NOTICE** that this Motion is being heard on regular notice

19  pursuant to Local Bankruptcy Rule 9013-1.  If you wish to oppose this Motion, you must file a written

20  response with the Bankruptcy Court and serve a copy of it upon the Debtor and the Debtor's attorney

21  at the address set forth above no less than fourteen (14) days prior to the above hearing date.  If you

22  fail to file a written response to this Motion within such time period, the Court may treat such failure

23  as a waiver of your right to oppose the Motion and may grant the requested relief.

24  The undersigned hereby verifies that the above hearing date and time were available for this

25  type of Motion according to the Court's self-calendaring procedures.

26  **WHEREFORE**, the Debtor prays that this Court enter its order granting the following relief:

27  1.  Granting the Motion;

28  2.  Approving the Separation Agreement;

3.    Authorizing and directing the Debtor to enter into the Separation Agreement and sign any

reasonably requested documents and take all acts necessary to effectuate the Separation

Agreement; and

4.    Granting to the Debtor such other and further relief as the Court deems just and proper.

DATED: March 8, 2012                    **GOE & FORSYTHE, LLP**

By: /s/Robert P. Goe
       Robert P. Goe
       [Proposed] Attorneys for
       for Debtor and Debtor-in-Possession

-3-

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.

3

### STATEMENT OF FACTS

4

#### A.   The Debtor.

5    On January 21, 2011 (the "Petition Date"), the Debtor filed his voluntary Chapter 11 petition

6 under Chapter 11 of the United States Bankruptcy Code. The Debtor was the Chief Executive Officer

7 and sole director and shareholder of Anatomic Global, Inc. ("AGI"), a non-debtor. On May 27, 2011,

8 this Court entered its Order (Docket No. 45) approving a settlement (the "AGI Settlement"), resolving

9 contentious litigation between FXI, on the one hand, and the Debtor and AGI, on the other hand. On

10 December 28, 2011, this Court entered an Order (Docket No. 77) denying a motion for

11 reconsideration of the AGI Settlement by Sinomax Polyurethanes (Shanghai) Co. Ltd. and Sino

12 Century Development Ltd. As part of the implementation of the AGI Settlement, FXI formed the

13 Company and the Company acquired the assets of AGI. The Debtor became an employee of the

14 Company pursuant to the Employment Agreement. *See* **Exhibit "B"** (Employment Agreement).

15    Since the Petition Date, the Debtor has continued to function as a debtor and debtor-in-

16 possession.

17

#### B.   The Settlement.

18    The Company and FXI desire to end the Debtor's employment with the Company and have

19 negotiated the Separation Agreement, subject to Bankruptcy Court approval, to effectuate the

20 separation. *See* **Exhibit A** (Separation Agreement). The material terms of the Separation

21 Agreement[1] comply with the provisions of the Employment Agreement for a separation without cause

22 and for the length of time that the Debtor was employed by the Company and include the following:

23       • receipt of salary payments for a period of fifty-two weeks in accordance with the

24          Company's regular payroll practice.

25

26

27 [1] Parties are directed to the Separation Agreement for a complete statement of all the terms. A good faith effort has been made to accurately summarize the material terms of the Separation Agreement. If there are any inconsistencies between the summary of the material terms contained in this Motion and the Separation Agreement itself, the Separation

28 Agreement controls.

-4-

1    • payment of Earn Out Payments (as defined in the Employment Agreement), if any, to

2      which the Debtor is entitled under Section 5.5(b)(ii) of the Employment Agreement

3      for the period August 1, 2011 through December 31, 2014 in accordance with the

4      terms of such section.

5    • payment of a lump sum of $42,000, representing the remaining unpaid payments on

6      the Earn Out Payment advance for the period January 2012 through May 2012 under

7      the Employment Agreement.

8    • group health coverage at the Debtor's expense for himself and his eligible dependents

9      under the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985.

10   • a release of all claims by the Debtor against the Company and FXI, including a waiver

11     of unknown claims under California Civil Code Section 1542 ("Section 1542"), and

12     excepting only certain Excluded Claims (as defined in Section 2.4 of the Separation

13     Agreement).[2]

14   • a release of all claims by the Company and FXI against the Debtor, including a

15     Section 1542 waiver of unknown claims, excepting only claims for fraud where the

16     factual basis for such claim is not discovered by the Company until after the

17     effectiveness of the release.

18        For the reasons set forth below, the Debtor requests the Court to approve the Separation

19   Agreement and authorize and direct the Debtor to take such other steps as reasonably necessary to

20   effectuate the Separation Agreement.

21                                              **II.**

22        **THE SEPARATION AGREEMENT IS REASONABLE, FAIR AND**

23      **EQUITABLE AND IS IN THE BEST INTERESTS OF THE ESTATE**

24        The Debtor believes that the Separation Agreement is in the best interest of the estate and

25   meets all of the requirements of Fed. R. Bankr. P. 9019(a), which provides that:

26

27   _____

28   [2] In connection with the AGI Settlement, the Debtor previously granted a full release and waiver of claims under Section
     1542 to FXI of all prepetition claims and postpetition claims through the effective date of the AGI Settlement.

                                              -5-

On motion of the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

It is well established that the law favors compromise. *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986) ("The law favors compromise and not litigation for its own sake…"); *In re Michael*, 183 B.R. 230, 233 (Bankr.D.Mont. 1995) ("it is also well established that the law favors compromise") *citing In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976); *In re Stein*, 236 B.R. 34, 37 (D.Or. 1999) ("Pursuant to Bankruptcy Rule 9019(a), compromises are favored in bankruptcy"); *In re Pierce Packing Co.*, 1994 WL 831374, *2 (Bankr.D.Mont. 1994) ("it is also well established that the law favors compromise").

The Ninth Circuit has recognized that "[t]he bankruptcy court has great latitude in approving compromise agreements." *A & C Properties*, 784 F.2d at 1380-81. A bankruptcy court is not required to decide the questions of law and fact raised in the controversies sought to be settled, nor is it required to determine whether the settlement presented is the best one that could possibly have been achieved. Rather, it is sufficient that the settlement not fall "below the lowest point in the zone of reasonableness." *Newman v. Stein*, 464 F.2d 689, 698 (2nd Cir. 1972), *cert. denied*, 409 U.S. 1039 (1972). *See also, In re Milden*, 111 F.3d 138, 1997 WL 189302, *3 (9th Cir. 1997) (unpublished) ("Rather than conducting a detailed evaluation of the merits of the state court action, the bankruptcy court's function is to examine the proposed settlement to determine if it falls below the lowest point in the range of reasonableness.") (internal quotation marks omitted); *In re Schmitt*, 215 B.R. 417, 423 (9th Cir. BAP 1997) ("When assessing a compromise, courts need not rule upon disputed facts and questions of law, but rather only canvass the issues. A mini trial on the merits is not required.")

"[C]ourts need not conduct an independent investigation in formulating an opinion as to the reasonableness of a settlement; rather, they may give weight to the trustee's informed judgment that a compromise is fair and equitable and to the competency and experience of counsel who support the settlement." *In re Boyer*, 354 B.R. 14, 30 (Bankr.D.Conn. 2006); *In re International Distribution Centers, Inc.*, 103 B.R. 420, 423 (S.D.N.Y. 1989) *citing In re Blair,* 538 F.2d 849, 851 (9th Cir.1976).

-6-

1   "All that [the trustee] must do is establish to the reasonable satisfaction of [the Court] that, all

2   things considered, it is prudent to eliminate the risks of litigation to achieve specific certainty though

3   it might be considerably less (or more) than were the case fought to the bitter end." *In re Aloha Racing*

4   *Foundation, Inc.*, 257 B.R. 83, 88 (Bankr. N.D. Ala. 2000); *In re Golden Mane Acquisitions, Inc.,* 221

5   B.R. 963, 966 (Bankr.N.D.Ala.1997) (*quoting Florida Trailer & Equip. Co. v. Deal,* 284 F.2d 567,

6   573 (5th Cir.1960)).

7   The Trustee's burden "is not, however, a burden of proof regarding the underlying claim." *In*

8   *re Key3Media Group, Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005). That is, the trustee burden "is not

9   … a burden to prove or negate the underlying claim." *In re National Organization For Children, Inc*.,

10   2007 WL 1577753, 7 (Bankr. E.D. Pa. 2007).

11   The Ninth Circuit Court of Appeals has recognized that bankruptcy courts have wide

12   discretion in approving compromise agreements. *See A & C Properties*, 784 F.2d at 1380-81. The

13   Ninth Circuit has identified four factors that a bankruptcy court should consider in determining

14   whether a proposed settlement is fair and equitable:

15   "(i) the probability of success in the litigation; (ii) the difficulties, if
16   any, to be encountered in the matter of collection; (iii) the complexity
     of the litigation involved, and the expense, inconvenience and delay
17   necessarily attending it; [and] (iv) the paramount interest of the
     creditors and a proper deference to their reasonable views in the
18   premises."

19   *Id.* (quoting *Lambert v. Flight Transp. Corp. (In re Flight Transp. Corp. Sec. Litigs.),* 730 F.2d 1128,

20   1135 (8th Cir. 1984), *cert. denied*, 469 U.S. 1207 (1985)); *Woodson v. Fireman's Fund Ins. Co. (In re*

21   *Woodson)*, 839 F.2d 610, 620 (9th Cir. 1988).

22   Applying the four factors identified by the Ninth Circuit in determining whether a proposed

23   compromise is fair and equitable, it is clear that the Separation Agreement should be approved.

24   **A.    The Probability of Success on the Merits.**

25   The Debtor is not aware of any claims that he may have against the Company or FXI other

26   than the Excluded Claims. Accordingly, the probability of success on the merits does not apply to the

27   Separation Agreement.

28   / / /

-7-

**B.    Difficulty to Be Encountered in Collection.**

The Debtor is not aware of any claims that he may have against the Company or FXI other than the Excluded Claims. Accordingly, the difficulty in the collection prong does not apply to the Separation Agreement.

**C.    The Complexity, Expense and Inconvenience of Litigation.**

The Debtor is not aware of any claims that he may have against the Company or FXI other than the Excluded Claims. The Debtor's separation from the Company is without cause as described under the Employment Agreement. The Parties are exchanging, with certain limited carve-outs, full general releases and Section 1542 waivers, eliminating the potential complexity, expense and inconvenience of any future litigation. Accordingly, this part of the *A&C Properties* test favors court approval of the Separation Agreement.

**D.    The Interest of the Debtor's Creditors.**

By agreement the Company has the right to terminate Debtor's employment with the Company. Pursuant to the Separation Agreement, Debtor will receive all of the benefits due him under the Employment Agreement applicable to a termination without cause based upon the amount of time that he was employed with the Company. Although still subject to the non-compete provision contained in Section 4.3 of the Employment Agreement, the Debtor is not barred from seeking employment and earning income outside of the scope of the non-compete provision. Accordingly, the Debtor has the potential to earn even more income during the time that he is receiving the consideration due under the Separation Agreement

In addition, the Debtor is receiving a virtually full general release and Section 1542 waiver from the Company and FXI. As a result, he is free of the Company and has no possibility of the Company or FXI asserting claims against him (except for fraud based on unknown facts) which might not rise to the level of "cause" to terminate under the Employment Agreement, but could -- in the view of the Company or FXI -- lead to future disputes, litigation, expense, and liability. Therefore, upon application of the factors of the *A&C Properties* test, the Separation Agreement is fair and equitable and should be approved by the Court.

-8-

**III.**

**CONCLUSION**

Based upon the foregoing, the Debtor respectfully requests that this Court enter its order approving the Separation Agreement, authorizing and directing the Debtor to take such other steps and sign any reasonably requested documents as reasonably necessary to effectuate the Separation Agreement, and granting such other and further relief as is just and proper under the circumstances.

DATED: March 8, 2012                    **GOE & FORSYTHE, LLP**

By: /s/Robert P. Goe
Robert P. Goe
[Proposed] Attorneys
for Debtor and Debtor-in-Possession

# DECLARATION OF DAVID L. FARLEY

I, David L. Farley, hereby declare and state as follows:

1.     I am an individual and the debtor and debtor-in-possession herein (the "Debtor").[3]

2.     I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify thereto.

3.     On January 21, 2011 (the "Petition Date"), I filed my voluntary Chapter 11 petition under Chapter 11 of the United States Bankruptcy Code. I was the Chief Executive Officer and sole director and shareholder of Anatomic Global, Inc. ("AGI"), a non-debtor. On May 27, 2011, this Court entered its Order (Docket No. 45) approving a settlement (the "AGI Settlement"), resolving contentious litigation between FXI, on the one hand, and the Debtor and AGI, on the other hand. On December 28, 2011, this Court entered an Order (Docket No. 77) denying a motion for reconsideration of the AGI Settlement by Sinomax Polyurethanes (Shanghai) Co. Ltd. and Sino Century Development Ltd. As part of the implementation of the AGI Settlement, FXI formed the Company and the Company acquired the assets of AGI. I became an employee of the Company pursuant to the Employment Agreement. A true and correct copy of the Employment Agreement is attached hereto as **Exhibit "B".**

4.     Since the Petition Date, I have continued to function as a debtor and debtor-in-possession.

5.     The Company and FXI desire to end my employment with the Company and we have negotiated the Separation Agreement, subject to Bankruptcy Court approval, to effectuate the separation. A true and correct executed copy of the Separation Agreement is attached hereto as **Exhibit "A".** I request the Court to approve the Separation Agreement and authorize and direct me to take all steps reasonably necessary to effectuate the Separation Agreement.

6.     I am not aware of any claims that I may have against the Company or FXI except for Excluded Claims. The Parties agree that such separation is without cause as described under the

---

[3] Capitalized terms used herein but not otherwise defined shall have the meaning as set forth in the Motion.

1    Employment Agreement. To ensure that the separation remains amicable, the Parties are exchanging,

2    with certain limited carve-outs, full general releases and Section 1542 waivers, eliminating the

3    potential complexity, expense and inconvenience of any future litigation.

4          7.       Pursuant to the Separation Agreement, I will receive all of the benefits due to me

5    under the Employment Agreement, applicable to a termination without cause, based upon the amount

6    of time that I was employed with the Company. I am not barred from seeking employment and

7    earning income outside of the scope of the non-compete provision. Accordingly, I have the potential

8    to earn even more income during the time that I am receiving the consideration under the Separation

9    Agreement

10         8.       In addition, I will receive a virtually full general release and Section 1542 waiver from

11    the Company and FXI. As a result, I am free of the Company and have no possibility of the

12    Company or FXI asserting claims against me (except for fraud based on unknown facts) which might

13    not rise to the level of "cause" to terminate under the Employment Agreement, but could -- in the

14    view of the Company or FXI -- lead to future disputes, litigation, expense, and liability on my part

15    and the estate.

16         9.       I believe that the Separation Agreement substantially benefits the interests of my

17    estate. The Separation Agreement will limit my exposure to actual and potential claims, provide me

18    with compensation and other benefits due to me under the Employment Agreement applicable to a

19    termination without cause (based upon the amount of time that I was employed with the Company),

20    and, allow me to pursue other employment and potentially earn income. Thus, the Separation

21    Agreement is beneficial to the estate, will improve the financial condition of the estate and,

22    accordingly, will benefit my creditors.

23    ///

24    ///

25    ///

26

27

28

1     I declare under penalty of perjury under the laws of the United States of America that the

2 foregoing is true and correct.

3     Executed this 9th day of March 2012, at Chino Hills, California.

4

5

                David L. Farley

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-12-

# EXHIBIT A

## SEPARATION AND RELEASE AGREEMENT

This Separation and Release Agreement ("Agreement"), dated as of March 8, 2012 (the "*Execution Date*"), is entered into by and among David L. Farley ("Executive"), Anatomic Holdings, Inc. ("Company"), and FXI, Inc. (formerly known as Foamex Innovations Operating Company) d/b/a FXI ("FXI"). All capitalized terms not otherwise defined herein shall have the meaning set forth in the Employment Agreement (defined below).

WHEREAS, Executive, the Company, and FXI entered into an agreement regarding Executive's employment with Company, dated May 27, 2011 (the "*Employment Agreement*");

WHEREAS, the Company terminated Executive's employment effective January 5, 2012 (the "*Termination Date*"), with such termination being treated as a termination other than for Cause for purposes of the Employment Agreement;

WHEREAS, in connection with the foregoing, the Executive, the Company, and FXI have agreed to the following in connection with Executive's termination of employment, as set forth in this Agreement; and

WHEREAS, Executive desires to provide a Release and Waiver of Claims in substantially similar form to the Release and Waiver of Claims.

NOW, THEREFORE, in consideration of the recitals, promises, and other good and valuable consideration specified herein, the receipt and sufficiency of which is hereby acknowledged, Executive, the Company, and FXI, agree as follows:

### 1. EFFECTIVENESS OF AGREEMENT; TERMINATION OF EMPLOYMENT.

1.1 Effectiveness of Agreement. This Agreement shall become effective upon the Execution Date; *provided*, *however*, that if subsequent to Executive's execution of this Agreement, Executive fails to execute, or executes and then revokes, the Executive Release (as defined below), Company shall cease to have any obligations under Section 2.1 of this Agreement.

1.2 Termination of Employment. Effective as of the Termination Date, the Executive's employment with the Company and its affiliates shall terminate, and Executive shall be deemed to have resigned from all positions held with Company and its affiliates, including all officer, director, and board positions. The parties acknowledge that as of the Termination Date, Executive shall incur a "separation from service" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended ("*Section 409A*").

### 2. PAYMENTS AND BENEFITS

2.1 Severance Payments and Benefits. Subject to the expiration of the Revocation Period (as defined in Section 3.3 below), without revocation of the Executive Release (as defined in Section 3.1 below) by Executive and Executive's continued compliance with the Restrictive Covenants (as defined in Section 4 below), Company will pay to Executive the amounts specified in Section 5.5(b) of the Employment Agreement and provide the benefits to Executive in Section 5.5(b) of the Employment Agreement in consideration for Executive entering

into this Agreement, specifically including the Executive Release (as described in Section 3 below):

(a) Earn-Out Payments. Company shall promptly and without delay pay to Executive whatever Earn-Out Payments, if any, to which he is entitled under section 5.5(b)(ii) of the Employment Agreement, for the period August 1, 2011 through December 31, 2014 (the "*Earn-Out Period*"), in accordance with the terms of such section. During the Earn-Out Period, within 5 calendar days following each month's Board of Directors meeting of FXI Holdings, Inc., the Company and FXI shall provide to Executive a monthly profit and loss statement of the Company, in the form of Exhibit A attached hereto. Company and FXI reaffirms that the procedures specified in Article 3.1(c) of the Employment Agreement shall be strictly followed. FXI and Company also reaffirms that except as provided in Article 6.4 and 3.1(c) of the Employment Agreement with respect to the $100,000.00 advance, Company will not offset, set off or otherwise reduce any sums payable to Executive or reduce any Earn-Out Payment by any amount owed to FXI, the Company or any other FXI company or any third party or by AGI. FXI hereby reaffirms the obligations of Anatomic Operations, Inc. ("*AOI*") under that certain Supply Agreement, dated May 27, 2011 (the "*Supply Agreement*"), by and between AOI and Company, including, but not limited to, Section 3 of the Supply Agreement.

(b) Earn-Out Payment Advance. Company shall pay to Executive the lump sum of $42,000.00, representing the remaining unpaid payments on the Earn-Out Payment Advance for the period January 2012 through May 2012 under the Employment Agreement. Such payment shall be made in the next regular payroll period following the expiration of the Revocation Period without revocation of the Executive Release.

(c) Group Health Coverage. Commencing on February 1, 2012, under the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Executive and his eligible dependents shall be entitled to continued participation under the Company's medical and dental plans, under the provisions of COBRA at the full COBRA rate.

2.2    Other Payments and Benefits.

(a) Accrued Obligations. Company shall pay or provide to Executive on the Termination Date any Base Salary or other compensation earned but not paid to Executive prior to the Termination Date, including accrued but unused vacation pay. Company shall also pay or provide to Executive (i) any business expenses that remain unreimbursed as of the Termination Date, and (ii) any payments, benefits, or entitlements which are vested, fully and unconditionally earned or due pursuant to the Employment Agreement or any Company plan, policy, program or arrangement or other agreement.

2.3    Tax Withholding. Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld in respect of any payment and/or any benefit provided for under this Agreement pursuant to any applicable law or regulation.

2.4    Other. Notwithstanding anything contained herein, Executive is not releasing any claims with respect to (1) Executive's right to receive the Accrued/Other Obligations, (2)

Executive's rights under, and/or the provisions of, Articles V VI and VII of the Employment Agreement , (3) any breach by the Company and/or FXI of Section 2.1 (b) and/or 3.1(c) of the Employment Agreement, (4) Executive's right to be indemnified and advanced expenses pursuant to any corporate document of the Company (including without limitation the Employment Agreement) and/or FXI or applicable law or Executive's right to be covered under any applicable directors' and officers' liability insurance policies, (5) any rights as a shareholder of the Company or (6) any rights which arise after the date of this Release with respect to matters that occurred after such date (collectively, the "*Excluded Claims*").

## 3.  RELEASE; EXECUTIVE REPRESENTATIONS

3.1  Release by Executive. For and in consideration of the payment of the amounts and the provision of the benefits described in Sections 2.1 of this Agreement, Executive hereby agrees to execute a release of all claims in the form attached as Exhibit I hereto (the "*Executive Release*").

3.2  Release by Company. For and in consideration of the obligations of Executive as set forth in this Agreement, the Company hereby agrees to execute a release of claims against Executive in the form attached as Exhibit II hereto (the "*Company Release*").

3.3  Executive's Representations and Warranties.

Executive represents that he has carefully read and fully understands the terms of this Agreement, and that Executive has been advised to consult with an attorney and has availed himself of the opportunity to consult with an attorney prior to signing this Agreement. Executive acknowledges and agrees that he is executing this Agreement willingly, voluntarily and knowingly, of his own free will, and that he has not relied on any representations, promises or agreements of any kind made to him in connection with his decision to accept the terms of this Agreement. Executive further acknowledges, understands, and agrees that as of the Termination Date his employment with Company terminated. **Executive understands that he will not receive any payments or benefits until the seven (7) day revocation period provided for under the Executive Release has passed, and then, only if he has not revoked the Executive Release (such period, the "*Revocation Period*").**

## 4.  RESTRICTIVE COVENANTS

Executive hereby acknowledges and agrees that he shall continue to be bound by the confidentiality and non-competition covenants contained in Section 4.3 of the Employment Agreement (the "*Restrictive Covenants*"). Company acknowledges and agrees that Executive's involvement with World Bed, Inc. ("*World Bed*"), a not-for-profit entity, whether as a Board member, officer, employee, or consultant, shall not constitute a breach of the non-competition covenant of Section 4.3 of the Employment Agreement. Such involvement includes Executive's fund raising efforts and other activities involving mattress retailers on behalf of World Bed and this provision continues to apply provided that World Bed remains a not-for-profit entity. If Company fails to make a payment as set forth in Section 2.1 of this Agreement as of the scheduled payment date for such payment, Executive's obligations under the non-competition covenant of Section 4.3 of the Employment Agreement shall terminate upon failure to make such payment. Notwithstanding the preceding sentence, in the event that Company has proven in a civil proceeding or it has been proven in a criminal proceeding that Executive committed fraud during

the term of his employment with Company, Company shall be permitted to withhold future payments under Section 2.1 of this Agreement.

## 5. INDEMNIFICATION, COVENANTS, & D&O LIABILITY INSURANCE

The Executive, Company and FXI hereby acknowledge and specifically agree that the provisions of Article 3.1(c), 5, 6 and 7 of the Employment Agreement will continue in full force and effect, and are incorporated herein by reference to this Agreement. Executive specifically acknowledges and agrees that he will continue to cooperate fully with the Company and FXI with respect to the Cases referenced in Section 6.6. Company shall reimburse Executive for any ordinary course out-of-pocket expenses incurred in connection with his management of the Cases and to the extent either of the Cases proceed to trial, Company shall pay Executive at the rate of $75 per hour for his time in attending trial and for time spent fifteen (15) days prior to trial. Reimbursement of expenses shall be subject to Company's written policies relating to business-related expenses as in effect from time to time and any time spent on attending trial shall be billed on an invoice submitted to FXI by Executive and shall be paid by Company no later than twenty (20) days after submission of same.

## 6. COMPLIANCE WITH SECTION 409A

Notwithstanding the other provisions hereof, this Agreement is intended to comply with the requirements of Section 409A. Accordingly, all provisions herein, or incorporated by reference, shall be construed and interpreted to comply with Section 409A and if necessary, any such provision shall be deemed amended to comply with Section 409A and the regulations thereunder. Further, for purposes of the limitations on nonqualified deferred compensation under Section 409A, each payment of compensation under this Agreement shall be treated as a separate payment of compensation for purposes of Section 409A. Any amounts payable solely on account of an involuntary separation from service of Executive within the meaning of Section 409A shall be excludible from the requirements of Section 409A, either as involuntary separation pay or as short-term deferral amounts to the maximum possible extent. Any reimbursements or in-kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A, including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during the period of time specified in this Agreement, (ii) the amount of expenses eligible for reimbursement, or in kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in kind benefits to be provided, in any other calendar year, (iii) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred, and (iv) the right to reimbursement or in kind benefits is not subject to liquidation or exchange for another benefit.

## 7. GOVERNING LAW; RESOLUTION OF DISPUTES

### 7.1 Governing Law.

This Agreement, the Executive Release, and the Company Release shall each be governed and interpreted in accordance with and enforced in all respects pursuant to the laws of the State of California, irrespective of the choice of law rules of that or any other jurisdiction that direct the application of the laws of any jurisdiction other than the State of California.

### 7.2 Resolution of Disputes.

The provisions of Section 7.10 of the Employment Agreement shall apply to any disputes hereunder except for those matters arising under Sections 4.1, 4.2 or 4.3 of the Employment Agreement.

## 8. SEVERABILITY

If any provision of this Agreement is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of this Agreement or the remaining portion of a partially invalid provision, which shall remain in force, and, if possible, the provision in question shall be modified by the court so as to be rendered enforceable.

## 9. CONSTRUCTION

Each party and its counsel have reviewed this Agreement, the Executive Release, and the Company Release and have been provided the opportunity to review such documents and accordingly, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of such documents. Instead, the language of all parts of such documents shall be construed as a whole, and according to their fair meaning, and not strictly for or against either party.

## 10. ENTIRE AGREEMENT; COUNTERPARTS

10.1 The Agreement, the Employment Agreement, the Executive Release, and the Company Release, together set forth the entire agreement between the parties hereto and, after the expiration of the Revocation Period without revocation of the Executive Release by Executive, fully supersede any and all prior agreements or understandings between the parties hereto pertaining to the subject matter hereof.

10.2 This Agreement may be executed in one or more counterparts and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

10.3 This Agreement shall be binding upon the parties and their respective assignees and successors at such time as the United States Bankruptcy Court for the Central District of California in Case No. 6:11-bk-12031-DS entitled In re David L. Farley (the "Bankruptcy Court") shall have entered a Final Order (as defined below) approving it. "Final Order" means that on due notice, the Bankruptcy Court shall have heard a motion for approval of this Agreement as well as of any objections thereto, and shall have caused to be entered an order approving same, and the time for an appeal of such order shall have expired or if any appeals are

taken, all such appeals shall have been concluded, the time for further appeals shall have expired and the Bankruptcy Court shall have been authorized to approve this Agreement.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as
of the date first above written.

ANATOMIC HOLDINGS, INC.

By: _____
Name:
Title:    **Andrew R. Prusky**
          **Senior Vice President, Legal**

FXI, INC.

By: _____
Name: Donald W. Phillips
Title: Executive VP Manufacturing & Pmto

EXECUTIVE

_____
David L. Farley

**EXHIBIT A**

| | Dec 2010 | Jan 2011 | Feb 2011 | Mar 2011 | Apr 2011 | May 2011 | Jun 2011 | Jul 2011 | Aug 2011 | Sep 2011 | Oct 2011 | Nov 2011 | Dec 2011 | YTD Dec 2011 | YTD Dec 2010 | Variance $ Cur vs Prior | Variance % Cur vs Prior |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Sales | | | | | | | | | | | | | | | | | |
| 400210 - Intercompany Sales | | | | | | | | | | | | | | | | | |
| 400220 - Interplant Sales | | | | | | | | | | | | | | | | | |
| Cash Discounts | | | | | | | | | | | | | | | | | |
| Freight in Sales | | | | | | | | | | | | | | | | | |
| 400430 - Fuel Surcharge Write Off | | | | | | | | | | | | | | | | | |
| Allowances | | | | | | | | | | | | | | | | | |
| Sales Returns | | | | | | | | | | | | | | | | | |
| Volume Rebates/Bill Adj | | | | | | | | | | | | | | | | | |
| **Revenue** | | | | | | | | | | | | | | | | | |
| Material | | | | | | | | | | | | | | | | | |
| Labor | | | | | | | | | | | | | | | | | |
| Overhead | | | | | | | | | | | | | | | | | |
| Freight Out | | | | | | | | | | | | | | | | | |
| Fixed Asset Impairment | | | | | | | | | | | | | | | | | |
| Depreciation | | | | | | | | | | | | | | | | | |
| Cost of Sales (Dupe) | | | | | | | | | | | | | | | | | |
| **Cost of Sales** | | | | | | | | | | | | | | | | | |
| **Gross Profit** | | | | | | | | | | | | | | | | | |
| GP % | | | | | | | | | | | | | | | | | |
| Salary & Benefits | | | | | | | | | | | | | | | | | |
| 601370 - Bonus | | | | | | | | | | | | | | | | | |
| Indirect Materials &Samples | | | | | | | | | | | | | | | | | |
| Equipment | | | | | | | | | | | | | | | | | |
| Maintenance Expense | | | | | | | | | | | | | | | | | |
| Building Cost | | | | | | | | | | | | | | | | | |
| Technology | | | | | | | | | | | | | | | | | |
| Travel & Entertainment | | | | | | | | | | | | | | | | | |
| Professional Fees & Services | | | | | | | | | | | | | | | | | |
| Other Misc Expense | | | | | | | | | | | | | | | | | |
| Insurance & Tax | | | | | | | | | | | | | | | | | |
| Bank/Collection Costs | | | | | | | | | | | | | | | | | |
| 603010 - Bad Debt Exp | | | | | | | | | | | | | | | | | |
| Fees | | | | | | | | | | | | | | | | | |
| Transportation Cost | | | | | | | | | | | | | | | | | |
| 603510 - SGA Allocation to SBU | | | | | | | | | | | | | | | | | |
| Depreciation / Amortization | | | | | | | | | | | | | | | | | |
| 640100 - Corp Cost To CGS | | | | | | | | | | | | | | | | | |
| **S G & A** | | | | | | | | | | | | | | | | | |
| SG&A % | | | | | | | | | | | | | | | | | |
| **Operating Profit** | | | | | | | | | | | | | | | | | |
| Operating Profit % | | | | | | | | | | | | | | | | | |

(Report Name: ROLLPL)

Exhibit I

EXECUTIVE RELEASE AND WAIVER OF CLAIMS

David L. Farley ("Executive") has executed this release ("Executive Release") as of the date set forth below.

WHEREAS, Executive was employed by Anatomic Holdings, Inc. and FXI, Inc. (formerly known as Foamex Innovations Operating Company) d/b/a FXI ("FXI") pursuant to a written Employment Agreement dated May 27, 2011.

WHEREAS, Executive's employment has been terminated without cause pursuant to a Separation and Release Agreement among Executive, Anatomic Holdings, Inc. ("Company"), and FXI, Inc. (formerly known as Foamex Innovations Operating Company) d/b/a FXI ("FXI") dated as of March 8, 2012 ("Agreement").

WHEREAS, Executive is entitled to certain payments and benefits under the Agreement subject to his execution and delivery of this Executive Release to the Company and FX, and Executive not revoking this Executive Release.

WHEREAS, the capitalized terms herein shall have the meanings set forth in the Employment Agreement dated May 27, 2011 between the parties.

NOW THEREFORE, Executive, intending to be legally bound, agrees as follows:

1.    Release of Claims. In consideration for the severance payments as set forth in the Employment Agreement and other good and valuable consideration set forth therein, Executive hereby releases the Company and FXI, and its and their shareholders, directors, officers, employees, agents, attorneys, affiliates, parents, subsidiaries, predecessors, successors, assigns, and all persons acting by, through, under or in concert with any of them (but with respect to any entity, individual, agent, attorney or their affiliates, including any one acting by, through, under or in concert with any of them, only in its or his official capacity relating to the Company and not in its or his individual capacity unrelated to the Company), from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses, except for vested pension benefits under ERISA, and from any claims of any nature whatsoever, known or unknown, which Executive now has, claims to have, own, hold or which Executive at any time heretofore had, held, or claims to have, including without limitation, claims for: wrongful discharge; breach of covenant of good faith and fair dealing; intentional or negligent infliction of emotional distress; breach of contract or implied contract; negligence; misrepresentation; fraud; detrimental reliance; promissory estoppel; defamation; invasion of privacy; sexual harassment; breach of laws governing safety in the workplace; discrimination on the basis of sex, race, color, religion, age, national origin, status as a handicapped of disabled person or status of a non-citizen; any and all claims under the Age Discrimination in Employment Act ("ADEA"); any and all claims under Title VII of the Civil Rights Act of 1964; any and all claims under the Americans with Disabilities Act; any and all claims under state or local laws which prohibit improper discrimination; any and all claims under the California Fair Employment and

Housing Act ("FEHA") ("Released Claims"); provided, however, that this release shall not apply to any claims based on fraud where the factual basis for such claim is not discovered by Executive until after the date of this Executive Release. Notwithstanding the preceding sentence or any other provision of this Agreement, this Executive Release is not intended to interfere with Executive's right to file a charge with the Equal Employment Opportunity Commission (the "EEOC") in connection with any claim he believes he may have against the Company or FXI. However, by executing this Executive Release, Executive hereby waives the right to recover in any proceeding Executive may bring before the EEOC or any state human rights commission or in any proceeding brought by the EEOC or any state human rights commission on Executive's behalf. Nothing in this paragraph 1 is intended to release or affect Employee's rights under California Labor Code Section 2802. Notwithstanding the foregoing, Executive is not releasing any Excluded Claims (as defined in the Separation and Release Agreement).

2. Civil Code Section 1542. Except as to those Excluded Claims defined in the Separation and Release Agreement and any ERISA claim, Executive understands and agrees that with respect and only as to the Released Claims released in paragraph 1 above includes not only claims presently known to Executive, but also include all unknown claims, complaints, duties, obligations and causes of action relating to any matters of any kind that would otherwise come within the scope of the Released Claims as described in paragraph 1 of this Executive Release and Waiver of Claims but under no circumstances is this release to be interpreted to release the Excluded Claims defined in the Separation and Release Agreement or ERISA claims; provided, however, that this release shall not apply to any claims based on fraud where the factual basis for such claim is not discovered by Executive until after the date of this Executive Release. Executive acknowledges that he has been advised by legal counsel and is familiar with the provisions of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Executive, being aware of said code section, agrees to expressly waive any rights Executive may have thereunder, as well as under any other statute or common law principles of similar effect as to the Released Claims (as defined above); provided, however, that this waiver shall not apply to any claims based on fraud where the factual basis for such claim is not discovered by Executive until after the date of this Executive Release..

3. Additional Covenants and Acknowledgments. Except as to the Excluded Claims and ERISA claims, Executive further understands and agrees:

a.    That by signing this Executive Release he is voluntarily making a full and final compromise and settlement of any and all claims, disputed or otherwise, arising out of his employment relationship with the Company, including claims under the Age Discrimination in Employment Act (ADEA) which he may have, and that this Agreement will preclude any further or additional claims arising out of said relationship;

b.      That Executive has twenty-one (21) calendar days from the date this Agreement is
received by him to consider and accept the Agreement by signing and returning it to the
Company, and if so accepted, another seven (7) calendar days to revoke that acceptance
should he change his mind;

c.      That Executive has been informed by this writing that he has the right to consult
any attorney prior to signing this Agreement and has in fact been encouraged to do so by
the Company; and

d.      That Executive acknowledges that this Agreement is contractual and not a mere
recital; and agrees that this Agreement shall be given full force and effect and that it shall
be binding upon Executive's heirs, executors, successors, administrators and assigns.

4.      Acceptance of Agreement.  Executive should execute and deliver this Executive Release
        by registered or certified mail, or by overnight delivery, to:

        Andrew R Prusky – Senior Vice President, Legal
        FXI
        Rose Tree Corporate Center II
        Media, PA 19063-2076

5.      Applicable Law. This Executive Release shall be construed and enforced under and in
        accordance with the laws of the State of California.

        Executive represents and certifies that he has carefully read and fully understands all of
the provisions of this Executive Release and that he is signing this Executive Release voluntarily,
of his own free will and without duress; and that neither the Company nor FXI, its agents,
representatives or attorneys have made any representations concerning the terms or effects of this
Agreement other than contained herein.

        **IN WITNESS THEREOF**, Executive has duly executed this Executive Release on this

8th day of March 2012.

David L. Farley

## Exhibit II

## RELEASE AND WAIVER OF CLAIMS

Anatomic Holdings, Inc. ("Company") has executed this release ("Company Release") as of the date set forth below.

WHEREAS, David Farley's ("Executive") employment has been terminated without cause pursuant to a Separation and Release Agreement among Executive, Anatomic Holdings, Inc. ("Company"), and FXI, Inc. (formerly known as Foamex Innovations Operating Company) d/b/a FXI ("FXI") dated as of March 8, 2012 ("Agreement").

WHEREAS, Executive has agreed to certain obligations under the Agreement, partially in consideration for the execution by Company of this Company Release;

THEREFORE, Company agrees as follows:

1.    Release of Claims. In consideration for Executive's obligations under the Agreement and other good and valuable consideration set forth herein, Company and its parent, affiliates, and subsidiaries releases Executive from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses, and from any claims of any nature whatsoever, known or unknown, which Company now has, claims to have, own, hold or which Company at any time heretofore had, held, or claims to have, arising out of Executive's employment with Company; provided, however, that this release shall not apply to any claims based on fraud where the factual basis for such claim is not discovered by Company until after the date of this Company Release.

2.    Civil Code Section 1542. Company understands and agrees that the claims released in paragraph 1 above include not only claims presently known to Company, but also include all unknown claims, complaints, duties, obligations and causes of action relating to any matters of any kind that would otherwise come within the scope of the released claims as described in paragraph 1; provided, however, that this release shall not apply to any claims based on fraud where the factual basis for such claim is not discovered by Company until after the date of this Company Release. Company acknowledges that it has been advised by legal counsel and is familiar with the provisions of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE
CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR
AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR
HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH
THE DEBTOR.

Company, being aware of said code section, agrees to expressly waive any rights Company may have thereunder, as well as under any other statute or common law principles of similar effect; provided, however, that this waiver shall not apply to any claims based on fraud where the factual basis for such claim is not discovered by Company until after the date of this Company Release.

3.    Acceptance of Agreement. Company should execute and deliver this
Company Release by registered or certified mail, or by overnight delivery, to:

David L. Farley
2891 Venezia Terrace
Chino Hills, CA 91709

4.    Applicable Law. This Company Release shall be construed and enforced under
and in accordance with the laws of the Commonwealth of Pennsylvania.

IN WITNESS THEREOF, Company has duly executed this Company Release on this
8th day of March 2012.

ANATOMIC HOLDINGS, INC.

By: _____
    Name:  Andrew R. Prusky
    Title: Senior Vice President, Legal

FXI, INC.

By: _____
    Name: DOUGLAS W. PHILLIPS
    Title: EXECUTIVE VP HOME FURNISHINGS & MCO

# EXHIBIT B

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is dated May 27, 2011, and is entered into by and among Anatomic Holdings, Inc., a Delaware corporation (the "Company"), FXI, Inc., a Delaware corporation formerly known as Foamex Innovations Operating Company ("FXI"), and David L. Farley ("Executive").

**WHEREAS,** the Company desires to employ Executive as its Chief Executive Officer and Chairman of the Board and Executive is willing to accept such employment in each case on the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants and promises contained herein and for other good and valuable consideration, the parties, intending to be legally bound, hereby agree as follows:

### ARTICLE I.

### Employment, Duties and Responsibilities

1.1    Employment. During the Term (as defined in Section 2.1 hereof), Executive shall be employed as Chief Executive Officer of the Company, Chairman of the Board of Directors of the Company (the "Board"), and shall report to the designee of the Chief Executive Officer of FXI (the "FXI Manager"). The Executive represents that he is entering into this Agreement voluntarily.

1.2    Devotion of Time to the Company. During the Term, the Executive shall devote substantially all of his skill, knowledge and working time to the performance of the duties and responsibilities of his positions hereunder, except for vacation time and absence for sickness or similar disability. Notwithstanding the foregoing, nothing shall preclude Executive from devoting a portion of his time and efforts (and retaining remuneration, if any, for such services) to (i) his personal and family affairs and investments, (ii) charitable, educational, civic and political activities, or (iii) service on the boards and advisory committees of other for-profit and not-for-profit entities, in each case so long as such activities in (i), (ii), or (iii) do not materially interfere with the performance of his duties hereunder; and further provided that with respect to serving on the board or advisory committee of any for-profit entity on which Executive is not serving as of the Effective Date, Executive shall have obtained the prior written consent of the FXI Manager, which consent shall not be unreasonably withheld. The parties acknowledge and agree that Executive shall be permitted to continue to serve as a director or member of an advisory committee of each for-profit and not-for-profit entity on which Executive is serving as of the Effective Date, and further acknowledge and agree that Executive may be required to devote time to the wind-up and resolution of Anatomic Global, Inc. and matters arising therefrom.

1.3    Duties and Responsibilities. During the Term, Executive shall have such duties, responsibilities and authorities commensurate with his position as Chairman and Chief Executive Officer of the Company and as may be assigned to Executive from time to time by the FXI Manager consistent with Executive's position. It is the intention of the parties that Executive will be authorized to manage the day-to-day operations of the Company during the Term of the

Agreement, within the authority limits defined within FXI's standard corporate policies generally applicable to its senior executives.

## ARTICLE II.

### Term of Employment

2.1 Term.

(a) The "Initial Term" of Executive's employment under this Agreement shall commence on the date hereof (the "Effective Date") and shall continue through the close of business on July 31, 2016 (the "Scheduled Expiration Date"), unless sooner terminated in accordance with Section 5 below. Executive's employment hereunder shall be automatically extended on the terms and conditions set forth herein for successive one (1) year periods commencing on the Scheduled Expiration Date and each anniversary thereof, unless either party hereto gives written notice to the other party of its or his election not to so extend Executive's employment hereunder at least forty-five (45) days prior to the Scheduled Expiration Date or any anniversary thereof. The period during which Executive is employed pursuant to this Agreement (including the Initial Term and any extension thereof in accordance with this Section 2.1(a)) shall be referred to as the "Term."

(b) Each of the Company and FXI represents and warrants to Executive that (i) the execution, delivery and performance of this Agreement by it has been fully and validly authorized by all necessary corporate action, (ii) this Agreement constitutes the legal, valid and binding agreement and obligation of such party, enforceable against it in accordance with the terms hereof, (iii) the officer signing this Agreement on its behalf is duly authorized to do so, (iv) the execution, delivery and performance of this Agreement or the Retention Agreement (as defined in Section 4.3(d)) does not violate any applicable law, regulation, order, judgment or decree or any agreement, plan or corporate governance document to which it or an affiliate is a party or by which it or an affiliate is bound, and (v) except as separately disclosed in writing by FXI to Executive on the date hereof, neither it nor any of its affiliates is a party to or is bound by any agreement, obligation, commitment, order, judgment or decree that restricts or reasonably could be expected to restrict the ability of the Company or FXI or its affiliates to operate, expand or otherwise modify the Anatomic Global business acquired from AGI (as defined in Section 3.1(c)(i)) as part of the Retention Agreement, including but not limited to the types of products to be manufactured, marketed or sold, the channels of distribution in which any such products are to be marketed or sold, and the customers or types of customers to which any such product is to be manufactured, marketed or sold.

## ARTICLE III.

### Compensation and Expenses

3.1 Salary, Bonuses and Benefits. During the Term, Executive shall be entitled to the following:

(a) Salary. The Company shall pay Executive a base salary during the Term at a rate of Two Hundred Sixty Thousand Dollars ($260,000) per annum ("Base Salary"), payable in accordance with the normal payment procedures of the Company and subject to such

2

withholdings and other normal employee deductions as may be required by applicable law. The Compensation Committee of FXI Holdings, Inc. (the "Compensation Committee") shall review the Base Salary annually for increase (but not decrease), and may in its discretion increase the Base Salary or retain the then-current Base Salary following any such review. For purposes of this Agreement, after any increase to the Base Salary, the term "Base Salary" shall mean such increased amount.

(b)    Benefits. Executive shall be eligible to participate in group medical, dental, vision, life and disability insurance, 401(K) plan, paid vacation and other benefits that are offered by the Company and in which other senior executives of the Company are eligible to participate from time to time, provided that such benefits are subject to the terms and conditions of such benefit plans/arrangements and comply with all regulations governing such plans. To the extent FXI permits employees of the Company to participate in the benefit programs of FXI after the Effective Date, Executive shall be eligible to participate in any such benefit programs and to the extent Executive elects to participate in such FXI benefit programs, Executive shall no longer be eligible to participate in the Company's benefit programs upon the effective date of such transition.

(c)    Earn Out Payments. Executive shall be entitled to the following additional payments (collectively, the "Earn Out Payments") for the five (5)-month period commencing on August 1, 2011 and ending on December 31, 2011, the four (4) immediately following successive twelve (12)-month periods (i.e., January 1, 2012 – December 31, 2012; January 1, 2013 – December 31, 2013; January 1, 2014 – December 31, 2014; and January 1, 2015 – December 31, 2015), and the seven (7)-month period commencing on January 1, 2016 and ending on July 31, 2016 (such five (5)-year period, as may be extended pursuant to the terms of this Section, the "Earn-Out Period", and each measurement period in the Earn-Out Period specified above, is a "Measurement Period"), as follows:

A cash payment for each Measurement Period equal to 35% of the Operating Income (as defined herein) of the Company for such Measurement Period which is in excess of the Baseline (as defined herein) for such Measurement Period; provided that for any Operating Income during a Measurement Period in excess of the Base Case for such Measurement Period (as identified and set forth on Exhibit A attached hereto) up to and including 20.00% above such Base Case (the "Upside Operating Income"), Executive shall be paid 45.00% of such Upside Operating Income; provided further that for any Operating Income during a Measurement Period in excess of 20.00% above the Base Case for such Measurement Period, Executive shall be paid 50.00% of such excess. For the avoidance of doubt, the maximum cumulative consideration for the Earn Out Payments calculated using the foregoing formula shall not exceed $10,000,000. In the event that Company's performance during the Earn-Out Period is such that Executive is entitled, on a cumulative basis, to Earn Out Payments totaling $10,000,000, following such attainment, Executive shall be entitled to the following payment for each Measurement Period (or portion thereof) remaining in the Earn-Out Period: a cash payment for such Measurement Period (or portion thereof) equal to 25% of the Company's Operating Income for such Measurement Period (or portion thereof) in excess of the Adjusted Baseline (as defined below).

For purposes of this Agreement, the term "Operating Income" shall mean gross profit of the Company less total selling, general & administrative expenses of the Company recognized and determined on an accrual basis utilizing United States generally accepted accounting

3

principles ("GAAP"). Notwithstanding the foregoing, Operating Income for a Measurement Period shall be adjusted as follows:

(i) There shall be excluded any negative effect from any extraordinary or unusual non-recurring losses or expenses of the Company with respect to the retention of the collateral of Anatomic Global, Inc. ("AGI") by the Company, FXI and/or any FXI Company on the Effective Date, including without limitation any amounts paid as damages in connection with litigation resulting therefrom;

(ii) There shall be excluded any negative effect arising from any obligation or liability assumed or paid by the Company, FXI, or any FXI Company pursuant to Article VI to the extent that any such obligation or liability by its terms arose or was incurred on or prior to May 27, 2011. For the sake of clarity, (A) any obligation or liability relating to any agreement assumed by the Company pursuant to Article VI, which by its terms is incurred in accordance with GAAP, including any proper amortization thereof after May 27, 2011, shall be included within the calculation for determining Operating Income to the extent such expense is of a type and nature as mutually determined by the parties to be allocated to the Company for purposes of calculating Operating Income as set forth in the sentence immediately following clause (v) below, and (B) those amounts of Liabilities identified on Exhibit D for which the Company is entitled to reduce the Earn Out Payment shall not be included in the calculation of Operating Income regardless of when such Liabilities are incurred;

(iii) Any liability or obligation which is paid or incurred by the Company pursuant to the terms of Section 6.4 and reduces the amount of any Earn Out Payment earned and payable to Executive hereunder pursuant to the terms of Section 6.4; and (B) the amount of any Earn Out Payment paid to Executive hereunder during such Measurement Period, each shall not be deducted from operating revenue in the determination of Operating Income;

(iv) The revenues included in the determination of Operating Income shall include any amounts recovered by AGI in connection with or otherwise relating to the Sino Century/Sino Max litigation; and

(v) There shall be excluded any negative effect resulting from the assumption by Anatomic Operations, Inc. ("Operations") of any amounts owed by AGI to FXI pursuant to that certain Amended and Restated Loan and Security Agreement, dated as of November 10, 2010, between AGI and FXI (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement") and the Debtor Documents (as defined in the Loan Agreement), excluding the Guaranty (as defined in the Loan Agreement) (collectively, the "Assumed Debt").

It is the parties' intention that the Company will be charged with certain sales and marketing expenses, provided that the nature of such expenses, as mutually agreed by the parties, shall determine whether the Company or Operations will be charged. Furthermore, the parties shall determine the services and related cost for certain administrative and support services to be provided to the Company, all as mutually agreed upon by the parties hereto no later than August 1, 2011.

4

For purposes of this Agreement, the term "Baseline" shall mean $1,500,000 for any Measurement Period which is comprised of twelve (12) months, shall mean $625,000 for the Measurement Period of August 1, 2011 through and including December 31, 2011 (the "2011 Measurement Period"), and shall mean $875,000 for the Measurement Period of January 1, 2016 through and including July 31, 2016.

For purposes of this Agreement, the term "Adjusted Baseline" shall mean the Operating Income of the Company for the trailing twelve months at the time the Company's performance entitles Executive to cumulative Earn-Out Payments under this Section 3.1(c) of $10,000,000 (the "Cap"); provided that if the Cap is attained during a Measurement Period, the Adjusted Baseline used for calculating Executive's Earn-Out Payment for the remaining full and partial months in that Measurement Period shall be prorated by a fraction, the numerator of which is the number days left in such Measurement Period and the denominator of which is 365.

The Company agrees that it shall pay Executive a $100,000 advance against the Earn-Out Payments earned and payable to Executive under this Section, which advance shall be paid to Executive in twelve (12) substantially equal monthly installments commencing on June 1, 2011 and on the first day of the next eleven (11) calendar months thereafter. The Company shall be entitled to reduce (but not below zero) the Earn Out Payment for (a) the 2011 Measurement Period earned and payable to Executive pursuant this Section 3.1(c) for each dollar that the Company advances to Executive between June 1, 2011 and December 31, 2011 under this paragraph and (b) for the 2012 calendar year Measurement Period earned and payable to Executive pursuant to this Section 3.1(c) for each dollar that the Company advances to Executive between January 1, 2011 and May 31, 2011 under this paragraph. To the extent permissible by law, each such installment shall be considered a separate payment from each other installment.

Within 5 calendar days following each month's Board of Directors meeting of FXI Holdings, Inc., the Company shall provide to Executive a monthly profits and losses statement of the Company.

Within 15 calendar days following the Company's finalization of its financial statements for each of the Measurement Periods (provided that such financial statements shall be finalized no later than 45 days after the end of such Measurement Period), the Company shall prepare and deliver to the Executive a statement, in reasonable detail, setting forth the calculation of the Operating Income of the Company for the relevant Measurement Period and the resulting Earn Out Payment for such Measurement Period (the "Earn Out Statement"), together with a copy of the profits and losses statement of the Company for such Measurement Period. The Company's books and records and its profits and losses statements shall be maintained and prepared on an accrual basis in accordance with GAAP.

FXI shall permit the Executive or his agents access to the relevant books, records, facilities and employees of each FXI Company and the right to audit and examine such FXI Company's account and financial books and records to verify the Earn Out Statement. All such examinations shall occur upon reasonable notice to FXI and shall take place at such FXI Company's office with the full cooperation of such FXI Company. If, as a result of such examination, the Executive determines that any sums are due, the Company shall immediately pay the Executive the amount of such additional sums. In addition, if the amount of additional sums payable to the Executive is greater than five percent (5%) of the relevant period's Earn Out Payment as calculated by the Company, the Company shall reimburse the Executive for all

5

reasonable costs of the Executive's audit and examination. Neither the Executive's acceptance of any information or the Executive's audit or examination of a FXI Company's records shall waive the Executive's right to dispute the accuracy or completeness of any information supplied by such FXI Company.

If there is any dispute between the Company and Executive with respect to the amount of the Earn Out Payment for any Measurement Period, the Company shall pay out the undisputed amount of such Earn Out Payment as provided below and shall pay out any remaining amounts within 10 calendar days of the resolution of such dispute.

Any Earn Out Payment due to Executive under this Section 3.1(c) shall be deemed earned by Executive as of the last day of the applicable Measurement Period. Within 10 calendar days following the delivery of the Earn Out Statement for the applicable Measurement Period (but in no event later than March 15th of the year following the end of the applicable Measurement Period), the Company shall make a payment to Executive, by wire transfer of immediately available funds to such account as Executive shall designate in writing, in an amount equal to the Earn Out Payment for such Measurement Period, if any.

Except as otherwise provided in Section 6.4 and in this Section 3.1(c) with respect to the $100,000 advance, in no event shall the Company set-off, off-set or otherwise reduce any Earn Out Payment payable to Executive under this Section 3.1(c) by any amounts owed to FXI, the Company, any other FXI Company, or any third party by AGI or Executive.

(d)     Vacation.  Executive shall accrue paid vacation at the rate of four weeks per year, in accordance with Company's written policy, with a maximum accrued amount of twenty-five (25) days.

3.2     Expenses.

(a)     The Company will promptly and in the ordinary course reimburse Executive for reasonable business-related expenses incurred by him in connection with the performance of his duties hereunder during the Term, subject, however, to the Company's written policies relating to business-related expenses as in effect from time to time during the Term.

(b)     With regard to any provision that provides for reimbursement of costs and expenses or of in-kind benefits, except as permitted by Section 409A of the Internal Revenue Code, (i) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, (ii) the amount of expenses eligible for reimbursement or in-kind benefits to be provided during any taxable year shall not affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other taxable year, provided that the foregoing clause (ii) shall not be violated with regard to expenses reimbursed under any arrangement covered by Section 105(b) of the Internal Revenue Code solely because such expenses are subject to a limit related to the period the arrangement is in effect, and (iii) such payments shall be made no later than the last day of the Executive's taxable year following the taxable year in which the expense is incurred.

6

## ARTICLE IV.

### Exclusivity, Etc.

4.1     Exclusivity.  Executive agrees that during the Term he will not engage in any other business activities, pursued for gain, profit or other pecuniary advantage, except as permitted in Sections 1.2 and 4.2.  Executive agrees that all of his activities as an employee of the Company shall be in substantial conformity with all policies, rules and regulations and directions of the Company and FXI not inconsistent with this Agreement.  To the extent of any conflict between the policies, rules and regulations of the Company, on the one hand, and FXI, on the other hand, FXI's policies, rules and regulations shall govern.

4.2     Other Business Ventures.  Executive agrees that during the Term, he will not own, directly or indirectly, any controlling or substantial stock or other beneficial interest in any business enterprise which is engaged in, or competitive with, any business engaged in by the Company or FXI as of the Effective Date.

4.3     Confidentiality; Non-competition.

(a)     Executive agrees that he will not, at any time during or after the Term, for any reason or purpose whatsoever, other than in the ordinary course of performing his duties for the Company, use, publish, remove, copy or disclose to any party any information obtained by the Executive through his past or future affiliation with the Company or any subsidiary or affiliate of FXI (including without limitation Anatomic Operations, Inc.) (each, an "FXI Company"), however documented (including oral disclosure), concerning the Company's or any FXI Company's business and affairs, including:  data, know-how, and ideas; past, current and planned research and development, customer, supplier and distributor lists, contracts, billing histories, current and anticipated customer, supplier or distributor requirements; price and cost information; market studies; business plans and methods; computer software and programs; plans and projections for business opportunities for new or developing business; historical financial statements; financial projections and budgets; historical and projected sales; capital spending budgets and plans; the names and backgrounds of key personnel; commissions and salaries paid to personnel; personnel training and techniques and materials; and any other information, however documented (including oral disclosure), that the Company or any FXI Company treats or designates as confidential or proprietary information or that is a trade secret within the meaning of applicable trade secret law, and notes, analyses, compilations, studies, summaries and other material prepared by or for the Company or any FXI Company, containing or based on, in whole or in part, any information included in material prepared by or for the Company or any FXI Company containing, or based on, in whole or in part, any information included in the foregoing (collectively, the "Confidential Information").

(b)     Notwithstanding the foregoing, Confidential Information shall not include information that (i) is in the public domain other than as a result of a breach of this Section 4.3, (ii) the Company authorizes Executive to disclose, (iii) is required to be produced by Executive under order of a court of competent jurisdiction or a valid administrative or congressional subpoena, or (iv) is reasonably necessary for Executive to satisfy his obligations set forth in this Agreement, or to file or amend his tax returns; provided, however, that (1) upon issuance of any such order or subpoena, Executive shall promptly notify the Company and shall provide the Company with an opportunity (if then available) to contest the propriety of such order or

7

subpoena or restrict or condition the disclosure of such Confidential Information (or to arrange for appropriate safeguards against any further disclosure by the court or administrative or other body seeking to compel disclosure of such Confidential Information), any of the forgoing in this proviso to be at the Company's expense, and (2) prior to any use or disclosure of any Confidential Information pursuant to subsection (iv) above, Executive will provide the Company with reasonable prior written notice of his intent to use or disclose such information. Nothing in this Section 4.3 shall preclude Executive from disclosure or use of the Confidential Information (A) if such disclosure or use is appropriate and in the ordinary course of carrying out his duties as an employee or consultant of the Company or (B) which was acquired by the Company or any FXI Company from AGI to the extent necessary to permit Executive to resolve and wind-up the business and affairs of AGI, provided that Executive shall promptly notify FXI of such disclosure or use.

(c) Executive agrees not to remove from the premises of the Company, except as a director or an officer of the Company in the performance of his duties for the Company and its affiliates or except as specifically permitted in writing by the Company, any document or other object containing or reflecting any such Confidential Information. Executive recognizes that all such documents and objects, whether developed by him or by someone else, will be the sole and exclusive property of the Company. Upon termination of his employment hereunder, Executive shall forthwith deliver to the Company all such Confidential Information, including without limitation all lists of customers, correspondence, accounts, records and any other documents or property made or held by him or under his control in relation to the business or affairs of the Company, and no copy of any such Confidential Information shall be retained by him; provided, however, that nothing herein shall prevent Executive from retaining (i) his papers and other materials of a personal nature, including, without limitation, photographs, correspondence, personal diaries, calendars, and phone books, (ii) information showing his compensation or relating to reimbursement of his business expenses, (iii) information that is necessary for tax purposes, and (iv) copies of plans, programs, policies and agreements relating to his employment, or termination thereof, with the Company and its affiliates. Nothing in this Section 4.3(c) shall preclude Executive from removing from the premises of the Company or retaining a copy of any Confidential Information which was acquired by the Company or any FXI Company from AGI to the extent necessary to permit Executive to resolve and wind-up the business and affairs of AGI, provided that Executive shall promptly notify FXI of such disclosure or use.

(d) The Executive acknowledges that the services to be rendered by Executive to the Company are a special and unique character. The Executive agrees that, in consideration of (1) his employment hereunder, (2) FXI's agreement to investment of a substantial sum of money in the Company, (3) FXI releasing the Executive from the Continuing Guaranty, dated May 18, 2010, issued by the Executive in favor of FXI, (4) FXI entering into that certain Retention of Collateral and Release Agreement, dated as of the date hereof, with Executive and AGI (the "Retention Agreement"), pursuant to which, among other things, Company (as assignee of FXI) acquired all or substantially all of the operating assets of AGI and acquired the goodwill of AGI, and (5) the Company's agreement to pay Executive severance hereunder in the event of termination pursuant to Section 5.5, during the period of his employment with the Company and for a period of three (3) years following the date of termination of the Executive's employment with the Company, Executive shall not:

8

(i)     directly or indirectly (whether for compensation or otherwise) engage in (as a principal, shareholder, member, partner, director, manager, officer, agent, employee, consultant or otherwise), have any ownership interest in, be financially involved in or furnish capital or debt to, or otherwise be connected to or associated with any Person that engages in any activities that are the same as, or in competition with, the Company ("Competitive Business"), except that the foregoing shall not prohibit Executive from owning solely as a passive investment up to five percent (5%) of any class of equity securities of a Competitive Business whose securities are publicly traded on a national securities exchange or which is registered under Section 12(g) of the Securities Exchange Act of 1934;

(ii)    solicit, employ, or retain as a consultant or independent contractor, or permit any affiliate of Executive to solicit for employment, employ or retain as a consultant or independent contractor, any Person who is employed by or retained as a consultant or independent contractor by the Company or FXI as of the Effective Date, or was employed by or rendered services to the Company or FXI within the twelve (12) months immediately preceding the Effective Date; or

(iii)   solicit, induce, encourage or attempt to influence any customer, consultant, independent contractor, vendor or supplier of the Company or FXI to cease to do, or reduce the amount of business done with the Company following the Effective Date.

"Person" means any individual corporation, partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or governmental authority.

Executive acknowledges that (y) as of the date hereof, Executive is the owner of all of the capital stock of AGI and, accordingly, is an "owner of a business entity" as such term is used in California Business and Professions Code Section 16601 and that the assets of AGI acquired by Company pursuant to the Retention Agreement constitute all or substantially all of the operating assets of AGI and the goodwill of AGI, and (b) Executive has given the agreements set forth in this Section 4.3(d) as part of the consideration for FXI to enter into the Retention Agreement.

(e)     In the event of any conflict between the provisions of this Section 4.3 and the provisions of any other Company agreement, plan, policy, program or arrangement, whether entered into before, on or after the date of this Agreement, the provisions of this Section 4.3 shall control, unless Executive has expressly agreed in writing that the conflicting provision will override or amend this Section 4.3. Executive acknowledges and agrees that he is making these restrictive covenants in consideration of the Company entering into this Agreement.

(f)     Executive acknowledges that the restrictions contained in this Article 4, in view of the nature of the business in which the Company is engaged and the Executive's position with Company, are reasonable and necessary to protect the legitimate interests of the Company, and that any violation of those restrictions would result in irreparable injury to the Company. Executive, therefore, agrees that, in the event of his violation of any of those restrictions, the Company, shall be entitled to obtain from any court of competent jurisdictions: (a) preliminary and permanent injunctive relief against Executive, without the necessity of posting a bond or proving actual damages; and (b) in addition to such injunctive relief, recovery of damages from Executive and an equitable accounting of all commissions, earnings, profits and other benefits arising from such violation. The rights contained herein shall be cumulative and in addition to any other rights and remedies to which the Company may be entitled.

9

(g)   Executive agrees that if any portion of the foregoing covenants, or the application thereof, is construed to be invalid or unenforceable, the remainder of such covenant or covenants or the application thereof shall not be affected and shall remain in full force without regard to the invalid or unenforceable portions. If any covenant is held to be unenforceable because of the geographic area covered, the duration thereof, the scope thereof or any other reason, Executive agrees that the Court making such determination shall reduce the geographic area or duration and/or limit the scope thereof to provide the Company with the maximum protection permitted by law, and the covenant shall then be enforceable in its reduced from. If Executive violates any of the restrictions contained in Section 4.3(d), the period of such violation (from the commencement of any such violation until such time as such violation shall be cured or ceased by Executive) shall not count toward or be included in the restrictive periods contained in Section 4.3(d).

## ARTICLE V.

### Termination

5.1   Termination by the Company. The Company shall have the right to terminate Executive's employment at any time, with or without "Cause," subject to the specific contractual obligations of the Company to Executive described herein. For purposes of this Agreement, "Cause" shall mean (i) substantial and continued willful failure by Executive to perform his material duties hereunder which results, or could reasonably be expected to result, in material harm to the business or reputation of the Company, which failure is not cured (if curable) by Executive within thirty (30) days after written notice of such failure is delivered to Executive by the Company, (ii) gross misconduct relating to the performance of Executive's duties for the Company and its affiliates, including, without limitation, embezzlement, fraud or misappropriation of the Company's property, which misconduct is not cured (if curable) by Executive within thirty (30) days after written notice of such failure is delivered to Executive by the Company, (iii) the conviction of, or entry of a plea of guilty or *nolo contendere* to, a felony or other crime involving moral turpitude, or (iv) any material breach by Executive of any material obligation to the Company or any of its affiliates under this Agreement, which breach is not cured (if curable) by Executive within thirty (30) days after written notice of such failure is delivered to Executive by the Company. Anything herein to the contrary notwithstanding, Executive shall not be terminated for "Cause" within the meaning of clauses (i), (ii) or (iv) unless he receives written notice from the Company stating the basis for such termination.

5.2   Death. In the event Executive dies during the Term, this Agreement shall automatically terminate.

5.3   Disability. In the event that Executive shall suffer a Disability (as defined below), the Company or Executive shall have the right to terminate Executive's employment under this Agreement, such termination to be effective upon the giving of notice thereof to the other party in accordance with Section 7.4 hereof. For purposes of this Agreement, the term "Disability" means Executive is receiving long-term disability benefits under the Company's or FXI's plan(s) or, if there is no such plan, a physical or mental condition which has prevented Executive from performing his material duties hereunder for a period of at least ninety (90) consecutive days in any 365 day period or 120 non-consecutive days within any 365 day period as determined by a medical doctor mutually agreeable to Executive and the Company. If the parties cannot agree on

10

a medical doctor, Executive and the Company shall each choose a medical doctor, and the two medical doctors shall choose a third medical doctor, who shall be the approved "medical doctor" for this purpose.

5.4   Termination by Executive with or without Good Reason. Executive may terminate his employment hereunder at any time, with or without Good Reason; provided that any termination by Executive of his employment under this Agreement for Good Reason shall not be effective unless Executive has provided notice to the Company of the event giving rise to Good Reason no later than ninety (90) days after the date the event occurs or, if later, the date Executive learns (or should have learned) of such event. Each of the following will constitute "Good Reason" for purposes of this Agreement, unless otherwise agreed to in writing by Executive: (i) the failure to pay compensation required hereunder and such failure is not cured within fifteen (15) days after written notice of the same is received by the Company; (ii) Executive is required to move to a new location that is more than fifty (50) miles from the offices of the Company located in Corona, CA; (iii) any decrease in Executive's Base Salary; (iv) a material diminution in Executive's authority, duties or responsibilities; or (v) any material breach by the Company, or any of its affiliates, of any material obligation to Executive under this Agreement. Notwithstanding the above, Good Reason shall not exist unless the Executive has notified the FXI Manager of the actions or failures to act giving rise to Good Reason, and such actions or failures, if capable of being cured, shall not have been cured by the Company within thirty (30) days of the receipt of such notice and Executive has terminated his employment within sixty (60) days after so notifying the FXI Manager.

5.5   Effect of Termination.

(a)   In the event of termination of Executive's employment for any reason, the Company shall pay or provide Executive (or his beneficiary or, if he has not selected a beneficiary, his estate, in the event of his death) within thirty (30) days of the date of termination of employment: (i) any Base Salary or other compensation earned but not paid to Executive prior to the effective date of such termination, (ii) any business expenses incurred before termination that remain unreimbursed, (iii) any accrued but unused vacation days, and (iv) any payments, benefits, or entitlements which are vested, fully and unconditionally earned or due pursuant to this Agreement or any Company or FXI plan, policy, program or arrangement or other agreement (clauses (i) through (iv), "Accrued/Other Obligations").

(b)   In the event of a termination of Executive's employment by Executive for Good Reason or by the Company for reasons other than for Cause, death or Disability, in addition to any Accrued/Other Obligations, Executive shall, subject to the effectiveness of his execution of a release and waiver substantially in the form attached hereto as Exhibit B, be entitled to:

(i)   continued receipt of salary payments for a period of fifty-two (52) weeks from the date of termination (the "Severance Period") of employment, payable by the Company in accordance with the Company's regular payroll practices. The payment of the amounts described in this paragraph 5.5(b)(i) shall begin on the thirtieth (30th) day following the date of execution of the release and waiver in the form attached hereto as Exhibit B provided that such release and waiver has become irrevocable;

(ii)   payment of certain Earn Out Payments by the Company as follows:

11

| Month of Employment During Which Such Termination Occurs | Number of Years of Earn Out Payments Following Termination |
|---|---|
| First 18 | 3 |
| 19-42 | 2 |
| 43 – July 31, 2016 | 1; provided that for any termination occurring on or after August 1, 2015 through and including July 31, 2016, the Earn Out Payment shall be multiplied by a fraction, the numerator of which is the number of full and partial months (with partial months expressed as a decimal) left in such 12-month period and the denominator of which is 12. |

The Earn Out Payments for each of the number of years to which Executive is entitled pursuant to the above shall be determined pursuant to Section 3.1(c) assuming for purposes of such calculation that the Company's Operating Income for each such year equals the average of (A) the Operating Income of the Company for the twelve (12) months immediately preceding the month in which such termination occurs and (B) the Operating Income of the Company for the twelve (12) month period commencing on the first day of the month in which such termination occurs (the "Subsequent 12 Month Period"). The Company shall calculate the amount of the Earn Out Payments payable to Executive under this Section within 15 calendar days following the Company's finalization of its financial statements which cover the Subsequent 12 Month Period (provided that such financial statements shall be finalized no later than 45 days after the end of such Subsequent 12 Month Period) and deliver an Earn Out Statement with respect thereto, and all Earn Out Payments payable under this Section 5.5(b)(ii) shall be paid, (y) unless otherwise elected by the Company pursuant to (z) below, in a lump sum within 10 calendar days following the delivery of said Earn Out Statement (but in no event later than March 15th of the year following the end of the Subsequent 12 Month Period) or (z) if elected by the Company, in the following manner: the first yearly payment shall be made within 10 calendar days following the delivery of said Earn Out Statement (but in no event later than March 15th of the year following the end of the Subsequent 12 Month Period) and each subsequent yearly payment shall be made on the respective anniversary of the end of the

12

Subsequent 12 Month Period, and the first and each subsequent yearly payment shall be treated as a separate payment for purposes of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), provided that if Company elects option (z) and any payments made pursuant to option (z) ("Option Z Payments") shall be subject to the additional tax and interest imposed pursuant to Section 409A of the Code (or any successor thereto) or any comparable provision of state law (collectively, the "Excise Tax"), then the Company or its successor shall pay to the Executive within 30 days after payment of each Option Z Payment (or, if earlier, when the Executive is required to remit the Excise Tax with respect to such Option Z Payment) an additional amount (the "Gross-Up Payment") determined in accordance with the following provisions. The Gross-Up Payment shall be equal to the amount necessary so that the net amount retained by the Executive, after subtracting the Excise Tax and after also subtracting all federal, state or local income tax, FICA tax and Excise Tax on the Gross-Up Payment, shall be equal to the net amount the Executive would have retained if no Excise Tax had been imposed and no Gross-Up Payment had been made. It is intended that the Executive shall not suffer any loss or expense resulting from the assessment of any Excise Tax or the Company's reimbursement of the Executive for any such Excise Tax. For purpose of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay (i) federal income taxes at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made, and (ii) state and local income taxes at the highest marginal rates of taxation in the state and locality of the Executive's residence on the date of the Option Z Payment, net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes. Notwithstanding the foregoing, in the event that the Executive earns and receives cumulative Earn Out Payments (calculated including all Earn Out Payments received by Executive during his employment and the amount of any Earn Out Payments paid to Executive under this Section 5.5(b)(ii)) at least equal to the Cap, no further Earn Out Payments in excess of such Cap shall be paid to him under this Section 5.5(b)(ii).

(iii)   Executive shall be entitled to elect medical and/or dental continuation coverage under the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

(c)   In the event Executive's employment is terminated on account of death or Disability (as defined in Section 5.3 hereof), in addition to any Accrued/Other Obligations, Executive (or his beneficiary or, if he has not selected a beneficiary, his estate, in the event of his death) shall be entitled to:

13

(i) payment of the Earn Out Payments by the Company for a period of one year following the date of termination of Executive's employment, determined using the actual Operating Income of the Company for such period; and

(ii) Executive shall be entitled to elect medical and/or dental continuation coverage under the provisions of COBRA.

(d) Notwithstanding anything in this Section 5.5 or 5.6 to the contrary, in the event that the Executive is deemed to be a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code to the extent necessary to avoid adverse tax consequences under Section 409A of the Code and Executive is not "disabled" within the meaning of Section 409A(a)(2)(C) of the Code as of the date of separation from service, no payments hereunder that are "deferred compensation" subject to Section 409A of the Code shall be made to Executive prior to the date that is six (6) months after the date of the Executive's "separation from service" (as defined in Section 409A of the Code and any Treasury Regulations promulgated thereunder) or, if earlier, Executive's date of death. Following any applicable six (6) month delay, all such delayed payments will be paid in a single lump sum on the earliest permissible payment date.

5.6    Full Settlement; Payment Date. Except as specifically provided in this Agreement, Executive shall have no rights to compensation or benefits upon or after termination of employment except as may be specifically provided under the Company's and/or FXI's employee benefit plans. All payments due under Section 5.5(a)(iii) shall be paid in accordance with the applicable plan, policy, program, arrangement or other agreement. To the extent permissible by law, each payment and each installment described in Sections 5.5 and 5.6 shall be considered a separate payment from each other payment or installment.

5.7    Obligations; Withholding.

(a) The obligations of the Company under this Agreement shall not be affected by Executive's receipt of compensation and benefits from another employer in the event that Executive accepts new employment following the termination of his employment under this Agreement. Upon a breach by Executive of any of his obligations under Section 4.3, Executive shall no longer have any right to receive payments under Section 5.5(b).

(b) All payments to Executive under this Agreement may be reduced by applicable withholding by federal, state or local law.

## ARTICLE VI.

### Covenants

6.1 Intentionally Omitted.

6.2 Termination and Indemnification of Other Personal Guaranties and Commitments. The Company covenants and agrees that it shall use its best efforts to have the personal guaranties, commitments and/or obligations delivered by Executive and listed on Exhibit C attached hereto (the "Third Party Guaranties") terminated and released in full in connection with the Company's assumption or full satisfaction and discharge of the liabilities and obligations to which each such Third Party Guaranty relates. In the event the Company is unable or fails to have any Third Party Guaranty terminated and released in full, the Company agrees to fully

14

indemnify, defend, and hold Executive and his heirs, executors, administrators, successors and assigns (collectively, the "Indemnified Parties") harmless from and against any and all claims, demands, losses, liabilities, damages or expenses, including, without limitation, interest, penalties and reasonable attorneys' fees incurred as a result thereof ("Damages"), resulting or arising from such Third Party Guaranty.

6.3 Support and Funding of the Company. Each of the Company and FXI covenants and agrees that, during the Earn-Out Period, it shall, and shall cause its directors, officers and employees to:

6.3.1 Comply in all material respects with all applicable laws and regulations which are necessary for the Company's operation of its business (the "Business"), including without limitation, maintaining all facilities used in the Business and/or in manufacturing by Operations for the Business in material compliance with all such applicable laws and regulations;

6.3.2 Ensure that the Company has adequate capital and cash, marketing and other resources to meet its expenses and conduct its operations in accordance with the business and growth plan of the Company developed by Executive and approved by the FXI Manager;

6.3.3 Use diligent, consistent and good faith efforts to cause the Company to achieve Operating Income in excess of the Baseline (and, to the extent applicable, Adjusted Baseline); and

6.3.4 Ensure that the Assumed Debt has no negative effect upon the performance of the Company or the Executive's opportunity to fully achieve the Earn Out Payments.

6.4 Certain Obligations and Liabilities Reducing Earn Out Payments. As specifically identified for each obligation and liability of AGI and/or Executive described on Exhibit D attached hereto (each, a "Liability" and together, the "Liabilities"), the Company hereby either (a) assumes such Liability as of the Effective Date and agrees to timely and fully pay, defend, satisfy, discharge and perform such Liability as and when due (and if already due as of the Effective Date, pay such Liability within five (5) business days of the Effective Date) or (b) agrees to otherwise timely and fully satisfy and discharge such Liability as and when due (and if already due as of the Effective Date, pay such Liability within five (5) business days of the Effective Date). If either FXI or the Company receives from a third party any invoice or other demand relating to a Liability, such party shall give a copy thereof to Executive for review and approval (such approval not to be unreasonably withheld). If Executive receives from a third party any invoice or other demand relating to a Liability, Executive shall review same and provide a copy to the Company, together with his approval or disapproval of such invoice or other demand. To the extent that Executive does not approve any invoice or other demand, Executive and the Company shall cooperate in good faith and shall negotiate with the third party presenting such invoice or other demand to resolve any dispute, with the Company promptly paying the amount mutually agreed to resolve such dispute. The parties agree that the Company shall be entitled to reduce (but not below zero) the Earn Out Payment earned and payable to Executive under Section 3.1(c) hereof for each dollar that the Company pays to a third party in connection with a Liability during such Measurement Period or over such number of

15

Measurement Periods as specified for such Liability on Exhibit D attached hereto; provided that
to the extent that a specific dollar amount is not listed for any Liability identified on Exhibit D or
the amount paid by the Company to the third party to which any such listed Liability is owed
exceeds the amount specified on Exhibit D, the Company shall not be entitled to make such
reduction unless and until the amount of such payment is reviewed and approved by Executive as
provided above.

6.5 Other Obligations and Liabilities Not Reducing Earn Out Payments. As specifically
identified for each obligation and liability of AGI and/or Executive described on Exhibit E
attached hereto (each, an "Other Liability" and together, the "Other Liabilities"), the Company
hereby either (a) assumes such Other Liability as of the Effective Date and agrees to timely and
fully pay, defend, satisfy, discharge and perform such Other Liability as and when due (and if
already due as of the Effective Date, pay such Other Liability within five (5) business days of the
Effective Date) or (b) agrees to otherwise timely and fully satisfy and discharge such Other
Liability as and when due (and if already due as of the Effective Date, pay such Other Liability
within five (5) business days of the Effective Date). If FXI or the Company receives from a third
party any invoice or other demand relating to an Other Liability, such party shall give a copy
thereof to Executive for review and approval (such approval not to be unreasonably withheld). If
Executive receives from a third party any invoice or other demand relating to an Other Liability,
Executive shall review same and provide a copy to the Company, together with his approval or
disapproval of such invoice or other demand. To the extent that Executive does not approve any
invoice or other demand, Executive and the Company shall cooperate in good faith and shall
negotiate with the third party presenting such invoice or other demand to resolve any dispute,
with the Company promptly paying the amount mutually agreed to resolve such dispute. The
parties agree that no dollar amount paid by the Company in connection with the Other Liabilities
shall reduce any Earn Out Payment payable to Executive under Section 3.1(c) hereof. The
Company shall assume no liabilities, obligations, or duties of Anatomic Global, Inc. except for
the Liabilities and Other Liabilities, the contractual obligations relating to the contracts
specifically listed on Exhibit E, and as otherwise set forth in this Agreement. Except for the
foregoing and except for any other liability, obligation, or duty that the Company expressly
agrees to pay or perform under other provisions of this Agreement, the Company shall not be
liable for, and does not assume or agree to pay, perform, or discharge, any debt, claim, lien,
obligation, duty, contract, agreement, tax, or other liability of any kind or nature, known or
unknown, contingent or otherwise, related to Anatomic Global, Inc.

6.6 Pending Lawsuits. As of the Effective Date, the Company hereby (a) assumes the
defense of, and agrees to timely and diligently defend Executive and AGI from and against, the
pending and threatened lawsuits and claims identified on Exhibit F attached hereto (the "Cases"),
(b) agrees to timely pay all costs and expenses (including without limitation attorneys' fees and
expenses) incurred by Executive and AGI relating to the defense of such Cases prior to the
Effective Date (to the extent unpaid on the Effective Date), and (c) agrees to timely pay, upon
presentation of proper invoices, all costs and expenses (including without limitation attorneys'
fees and expenses) as hereafter incurred in the ordinary course of the defense of such Cases;
provided that Executive shall manage and oversee such Cases in his reasonable and good faith
discretion in coordination with SVP, Legal of FXI; provided further that the Company may elect,
but is not required, to pay any damages which are finally determined by a court of competent
jurisdiction to be owed by Executive and/or AGI in any such Case or which are to be paid by

16

Executive and/or AGI in connection with a settlement of such Case, as approved by Executive and the Company.

6.7 Guaranty and Indemnity. FXI hereby unconditionally and irrevocably guarantees to and for the benefit of Executive, the full and timely payment and performance of all of the duties, obligations and covenants of the Company under this Agreement strictly in accordance herewith. FXI acknowledges that the guaranty made by it under this Section is continuing in nature and applies to all payment and performance obligations of the Company under this Agreement, whether arising now or in the future. For the avoidance of doubt, there are no third party beneficiaries to this guaranty. This guaranty shall not be affected by Executive's failure or delay to enforce any of his rights, and FXI's obligations as guarantor are independent of the Company's obligations. In addition to any other rights Executive may have, FXI further agrees to unconditionally and irrevocably indemnify and hold harmless Executive and his heirs, legatees, personal representatives, successors and assigns (collectively, "Executive Group") from and against all claims, actions or causes of action, assessments, liabilities, settlements, judgments or judicial or arbitration compromises (whether voluntary or involuntary), losses, deficiencies, damages (including but not limited to incidental, consequential, special, indirect, enhanced and punitive), interests, fees, liens, fines, penalties, costs, expenses, obligations or responsibilities, whether known or unknown, fixed or unfixed, conditional or unconditional, liquidated or unliquidated, accrued, absolute, contingent or otherwise, including, but not limited to, reasonable attorneys fees and court costs (collectively referred to as "Damages"), as asserted against, imposed upon or incurred by Executive Group, directly or indirectly, to the extent such Damages directly or indirectly result or arise from or by reason of any misrepresentation or breach of any representation or warranty by the Company or FXI in this Agreement and any and all actions, suits, proceedings, demands, assessments, judgments, reasonable attorneys' fees, costs and expenses incident to any of the foregoing.

## ARTICLE VII.

### Miscellaneous

7.1    No Mitigation. Executive shall not be required to mitigate damages resulting from his termination of employment.

7.2    Indemnification/D&O Liability Insurance. The Company agrees before, during and after the Term to indemnify and hold harmless Executive (and advance him expenses) to the fullest extent permitted by the Company's articles of incorporation and/or by-laws, or if greater, in accordance with applicable law for actions or inactions of Executive as an officer, director, employee or agent of the Company or any affiliate or as a fiduciary of any benefit plan of any of the foregoing or as otherwise set forth in the applicable document. FXI also agrees to provide Executive with directors' and officers' liability insurance coverage both during and after employment, with regard to matters occurring during employment, which coverage will be at a level at least equal to the level being maintained at such time for the then current officers and directors of FXI and shall continue until such time as suits can no longer be brought against Executive as a matter of law.

17

7.3 Benefit of Agreement; Assignment; Beneficiary.

(i) This Agreement shall inure to the benefit of and be binding upon each party and its successors and assigns, including, without limitation, any corporation or person which may acquire all or substantially all of the Company's or FXI's, as the case may be, assets or business, or with or into which the Company or FXI, respectively, may be consolidated or merged. This Agreement shall also inure to the benefit of, and be enforceable by, Executive and his personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

(ii) No rights or obligations of Executive hereunder may be assigned or transferred by Executive, without the prior written consent of the Company, except to the extent permitted under any applicable plan, policy, program, arrangement of, or other agreement with, the Company and/or FXI or its affiliates or by will or operation of law. No rights or obligations of the Company or FXI under this Agreement may be assigned, without the prior written consent of Executive, except that such rights may be, and such obligations shall be, assigned or transferred pursuant to a merger or consolidation in which the Company or FXI, respectively, is not the continuing entity or a sale or liquidation or other disposition of all or substantially all of the assets of the Company or FXI, provided that the assignee or transferee is the successor to all or substantially all of the assets of the Company or FXI, as the case may be, and assumes in writing the liabilities, obligations and duties of the Company or FXI, respectively, under this Agreement. For the avoidance of doubt, "Company" shall include any successor entity to the Company; provided, however, upon any change in control of the beneficial ownership of a majority of the issued and outstanding equity securities of the Company, if such successor, transferee or assignee conducts businesses which were not conducted by the Company immediately prior to such transaction ("Other Businesses"), references to the Company and its affiliates or subsidiaries in Article IV of this Agreement shall not include such Other Businesses nor shall any reference to employees, agents, customers or suppliers include a reference to an employee, agent, customer or supplier of such successor entity unless such employee, agent, customer or supplier was also an employee, agent, customer or supplier of the Company immediately prior to such transaction. Any action taken by FXI under this Agreement shall be deemed to be an action by the Company.

(iii) If Executive should die while any amount, benefit or entitlement would still be payable (or due) to Executive hereunder if he had continued to live, all such amounts, benefits and entitlements shall be paid or provided in accordance with the terms of this Agreement to Executive's beneficiary, devisee, legatee or other designee. or if there is no such designee, to Executive's estate.

7.4 Notices. Any notice required or permitted hereunder shall be in writing and shall be sufficiently given if personally delivered, or if sent by registered or certified mail, postage prepaid, with return receipt requested, or by a nationally recognized overnight courier addressed: (a) in the case of the Company and/or FXI, to FXI, Attention: General Counsel at Rose Tree Corporate Center II, Media, PA 19063-2076, or to such other address and/or to the attention of such other person as the Company shall designate by written notice to Executive; and (b) in the case of Executive, to his then current home address as shown on the Company's records. or to such other address as Executive shall designate by written notice to the Company. Any notice

18

given hereunder shall be deemed to have been given at the time of receipt thereof by the person to whom such notice is given (which in the case of registered or certified mail or overnight courier, shall be the date acknowledgement of delivery is obtained by such service). Any notice given to Foamex Innovations, Inc. by Executive shall be deemed to be a notice to the Company for purposes of this Agreement.

7.5    Entire Agreement: Amendment. This Agreement shall be effective and binding on the parties as of the date first written above. Except as noted in this Agreement, this Agreement contains the entire agreement of the parties hereto with respect to the subject matter hereof, including, without limitation, the terms and conditions of Executive's employment during the Term, and supersedes any and all prior agreements and understandings, whether written or oral, between the parties hereto with respect to such subject matter. This Agreement may not be changed or modified except by an instrument in writing signed by all of the parties hereto, specifically referencing the provision being so changed or modified.

7.6    Waiver. The waiver by a party of a breach of any provision of this Agreement shall not operate or be construed as a continuing waiver or as a consent to or waiver of any subsequent breach hereof.

7.7    Headings. The Article and Section headings herein are for convenience of reference only do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

7.8    Governing Law. This Agreement shall be governed by, and construed and interpreted in accordance with, the internal laws of the State of California without reference to the principles of conflict of laws.

7.9    Agreement to Take Actions. Each party hereto shall execute and deliver such documents, certificates, agreements and other instruments, and shall take such other actions (and use its best efforts to cause third parties referenced herein or any Exhibit hereto to take such other actions), as may be reasonably necessary or desirable in order to effectuate the purposes hereof (including without limitation (a) the purposes and intent of Article VI hereof and (b) the filing of a Form UCC-3 or similar statement in order to terminate any financing statement previously filed with respect to Executive in order to perfect or otherwise give public notice of any security interest which is to be terminated and released pursuant to Article VI hereof).

7.10    Arbitration. Except for disputes with respect to Section 4.1(b), 4.2 or Section 4.3 hereof, any dispute between the parties hereto respecting the meaning and intent of this Agreement or any of its terms and provisions (each, a "Covered Claim") shall be submitted to arbitration in Orange County, California, in accordance with the Commercial Rules of the American Arbitration Association then in effect, and the arbitration determination resulting from any such submission shall be final and binding upon the parties hereto. The Company shall be responsible for the costs of the arbitration, and each party will be responsible for his or its own legal fees and expenses in connection with any Covered Claim; provided that if Executive is the prevailing party in any Covered Claim, he shall be entitled to reimbursement for his reasonable attorneys' fees and expenses in connection therewith. Judgment upon any such arbitration award may be entered in any court of competent jurisdiction.

7.11    Section 409A. The parties agree that if any payment or the provision of any amount, benefit or entitlement hereunder at the time specified in this Agreement would subject

19

Executive to any additional tax or interest or penalties under Section 409A of the Internal
Revenue Code of 1986, as amended and its implementing regulations or guidance ("Section
409A"), the payment or provision of such amount, benefit or entitlement shall be postponed to
the earliest commencement date on which the payment or the provision of such amount, benefit
or entitlement could be made without incurring such additional tax, interest or penalties
(including paying any severance that is delayed in a lump sum upon the earliest possible
payment date which is consistent with Section 409A). In addition, to the extent that any
regulations or guidance issued under Section 409A (after application of the previous provision of
this paragraph) would result in Executive being subject to the payment of interest, penalties or
any additional tax under Section 409A, the parties agree, to the extent reasonably possible, to
amend this Agreement in order to avoid the imposition of any such interest, penalties or
additional tax under Section 409A, which amendment shall be reasonably determined in good
faith by the Company and Executive.

     7.12   Survivorship. The respective rights and obligations and representations and
warranties of the parties hereunder shall survive any expiration or termination of the Term of this
Agreement to the extent necessary to give effect to the intended preservation of such rights and
obligations (including without limitation the survival of the following: Articles IV, V, VI, and
VII, Sections 2.1(b) and 3.1(c)).

     7.13   Validity. The invalidity or unenforceability of any provision or provisions of this
Agreement shall not affect the validity or enforceability of any other provision or provisions of
this Agreement, which shall remain in full force and effect.

     7.14   Counterparts. This Agreement may be executed in one or more counterparts, each
of which shall be deemed to be an original but all of which together will constitute one and the
same instrument. Signatures delivered by facsimile shall be effective for all purposes.

*[Signature Page Follows]*

20

**IN WITNESS WHEREOF**, each of the parties hereto has duly executed this Agreement effective as of the date first above written.

ANATOMIC HOLDINGS, INC.

By: _____
Name: Harold J. Farley
Title: EVP & CFO

FXI, INC. (f/k/a Foamex Innovations Operating Company)

By: _____
Name: Harold J. Earley
Title: EVP & CFO

EXECUTIVE

_____

David L. Farley

21

IN WITNESS WHEREOF, each of the parties hereto has duly executed this Agreement effective as of the date first above written.

ANATOMIC HOLDINGS, INC.

By: _____

    Name:

    Title:

FXI, INC. (f/k/a Foamex Innovations Operating Company)

By: _____

    Name:

    Title:

EXECUTIVE

_____

David L. Farley

## Exhibit A
## Earn Out Spreadsheet

|  | 2011 (2) | 2012 | 2013 | 2014 | 2015 (2) | |
|---|---|---|---|---|---|---|
| Sales | $ 29,362 $ | 35,367 $ | 43,149 $ | 53,735 $ | 68,104 | |
| Foam Costs (1) | $ 13,037 $ | 15,703 $ | 19,158 $ | 23,858 $ | 30,238 | |
| Foam Costs % of Net Sales | 44% | 44% | 44% | 44% | 44% | |
| Other Manufacturing Costs | $ 7,408 $ | 8,792 $ | 10,572 $ | 13,846 $ | 17,523 | |
| Other Material Costs % of Net Sales | 25% | 25% | 25% | 26% | 26% | |
| Overhead | $ 1,421 $ | 1,556 $ | 1,608 $ | 1,638 $ | 1,671 | |
| Total Costs of Goods Sold | $ 21,866 $ | 26,051 $ | 31,338 $ | 39,342 $ | 49,432 | |
| Gross Profit | $ 7,496 $ | 9,316 $ | 11,811 $ | 14,393 $ | 18,672 | |
| Selling Expenses | $ 1,914 $ | 2,936 $ | 4,247 $ | 5,323 $ | 6,552 | |
| G&A Expenses | $ 2,488 $ | 3,123 $ | 3,385 $ | 3,586 $ | 3,773 | |
| Operating Income | $ 3,094 $ | 3,257 $ | 4,179 $ | 5,484 $ | 8,347 | |
| Base Line Operating Income | $ 1,500 $ | 1,500 $ | 1,500 $ | 1,500 $ | 1,500 | |
|  |  |  |  |  |  | 5yr Cumm Earnout |
| Farley Earnout (Base Case) | $ 558 $ | 615 $ | 938 $ | 1,394 $ | 2,396 | $ 5,901 |

**Assume Operating Income Exceeds Base Case by 20%**

|  | 2011 (2) | 2012 | 2013 | 2014 | 2015 (2) | |
|---|---|---|---|---|---|---|
| Upside Operating Income | $ 3,713 $ | 3,908 $ | 5,015 $ | 6,581 $ | 10,016 | |
| Farley Earnout (Upside) | $ 836 $ | 908 $ | 1,314 $ | 1,888 $ | 3,148 | $ 8,094 |

**Assume Operating Income Exceeds Base Case by 40%**

|  | 2011 (2) | 2012 | 2013 | 2014 | 2015 (2) | |
|---|---|---|---|---|---|---|
| Upside Operating Income | $ 4,332 $ | 4,560 $ | 5,851 $ | 7,678 $ | 11,686 | |
| Farley Earnout (Upside) | $ 1,146 $ | 1,234 $ | 1,732 $ | 2,436 $ | 3,982 | $ 10,530 |

(1) Assumes a 14% overall reduction in material costs as % of Revenue vs. current run rate
(2) Amounts would be pro-rated pursuant to Section 3.1(c) of the Agreement.

| Base Earnout % | 35% |
|---|---|
| Upside Earnout% | 45% |
| Max Earnout % | 50% |

## Exhibit B

## Release

_____ ("Executive") has executed this release ("Release") as of the date set forth
below.

WHEREAS, Executive's employment has been terminated by the Company without
Cause or by the Executive for Good Reason pursuant to an employment agreement among
Executive, Anatomic Holdings, Inc. (the "Company"), and FXI, Inc. ("FXI"), dated as of May
___, 2011 (the "Employment Agreement").

WHEREAS, Executive is entitled to certain payments and benefits under the
Employment Agreement subject to his execution and delivery of this Release to the Company.

THEREFORE, Executive agrees as follows:

1.      Release of Claims.  In consideration for the severance payments by the Company
as set forth in the Employment Agreement and other good and valuable consideration set forth
herein, Executive hereby releases the Company, its shareholders, directors, officers, employees,
agents, attorneys, affiliates, parents, subsidiaries, predecessors, successors, assigns, and all
persons acting by, through, under or in concert with any of them (but with respect to any entity,
individual, agent, attorney or their affiliates, including any one acting by, through, under or in
concert with any of them, only in its or his official capacity relating to the Company and not in
its or his individual capacity unrelated to the Company), from any and all charges, complaints,
claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of
action, suits, rights, demands, costs, losses, debts and expenses, and from any claims of any
nature whatsoever, except for vested pension benefits under the Employment Retirement Income
Security Act ("ERISA"), known or unknown, which Executive now has, claims to have, own,
hold or which Executive at any time heretofore had, held, or claims to have, including without
limitation, claims for: wrongful discharge; breach of covenant of good faith and fair dealing;
intentional or negligent infliction of emotional distress; breach of contract or implied contract;
negligence; misrepresentation; fraud; detrimental reliance; promissory estoppel; defamation;
invasion of privacy; sexual harassment; breach of laws governing safety in the workplace;
discrimination on the basis of sex, race, color, religion, age, national origin, status as a
handicapped or disabled person or status of a non-citizen; any and all claims under the Age
Discrimination in Employment Act ("ADEA"); any and all claims under Title VII of the Civil
Rights Act of 1964; any and all claims under the Americans with Disabilities Act; any and all
claims under state or local laws which prohibit improper discrimination; and any and all claims
for benefits under the ERISA, except for all claims for vested pension benefits under ERISA.
Notwithstanding the preceding sentence or any other provision of this Release, this Release is
not intended to interfere with Executive's right to file a charge with the Equal Employment
Opportunity Commission (the "EEOC") in connection with any claim he believes he may have
against the Company.  However, by executing this Release, Executive hereby waives the right to
recover in any proceeding Executive may bring before the EEOC or any state human rights
commission or in any proceeding brought by the EEOC or any state human rights commission on
Executive's behalf.  Notwithstanding the foregoing, Executive is not releasing any claims

hereunder with respect to (1) Executive's right to receive the Accrued/Other Obligations, (2) Executive's rights under, and/or the provisions of, Articles V, VI and VII, (3) any breach by the Company and/or FXI of Section 2.1(b) and/or 3.1(c) of the Employment Agreement, (4) Executive's right to be indemnified and advanced expenses pursuant to any corporate document of the Company (including without limitation the Employment Agreement) and/or FXI or applicable law or Executive's right to be covered under any applicable directors' and officers' liability insurance policies, (5) any rights as a shareholder of the Company or (6) any rights which arise after the date of this Release with respect to matters that occurred after such date.

2.     No Right to Re-employment.  Executive hereby agrees and recognizes that his employment relationship with the Company or its affiliates is being permanently and irrevocably severed and that the Company has no obligation, contractual or otherwise, to rehire, re-employ, recall or to hire him in the future, or return him to active status.

3.     Additional Covenants and Acknowledgments.  Executive further understands and agrees:

a)     that by signing this Release he is voluntarily making a full and final compromise and settlement of any and all claims, disputed or otherwise, arising out of his employment relationship with the Company including claims under the Age Discrimination in Employment Act ("ADEA") which he may have, and that this Release will preclude any further or additional claims arising out of said relationship, but will not preclude any claims which might arise after this Release is executed; provided, that this Release is not intended to interfere with Executive's right to challenge that his waiver of any and all ADEA claims pursuant to this Release is a knowing and voluntary waiver, notwithstanding Executive's specific representation that he has executed this Release knowingly and voluntarily;

b)     that, in accordance with the federal law, Executive has twenty-one (21) calendar days from the date this Release is received by him to consider and accept this Release by signing and returning it to the Company, and if so accepted, another seven (7) calendar days to revoke that acceptance should he change his mind;

c)     that Executive has the right to consult any attorney prior to signing this Release and has been encouraged to do so by the Company; and

d)     that Executive acknowledges that this Release is contractual and not a mere recital; and agrees that this Release shall be given full force and effect and that it shall be binding upon Executive's heirs, executors, successors, administrators and assigns.

4.     Period for Acceptance of Agreement.  Executive shall have no less than twenty-one (21) calendar days from the date his employment is terminated under the Employment Agreement to consider this Release and he should execute and deliver this Release to the Company in accordance with the notice provisions of the Employment Agreement.

5.     Applicable Law.  This Release shall be construed and enforced under and in accordance with the laws of the State of California.

Executive represents and certifies that he has carefully read and fully understands all of the provisions of this Release and that he is signing this Release voluntarily, of his own free will

and without duress; and that the Company, its agents, representatives or attorneys have made no representations concerning the terms or effects of this Agreement other than contained herein.

    **IN WITNESS THEREOF**, Executive has duly executed this Release on this day of

_____, 20___.


_____       _____

[Name of Executive]             Date

## Exhibit C

## Indemnified Personal Guaranties

Guaranty, dated as of November 3, 2010, in favor of Celtic Capital Corporation.

Guarantee, dated as of May 17, 2006, in favor of Club Drive Partners and Oltmans Investment Company LLC dba Old Temescal Road Tenants-in-Common (Corona lease).

Guaranty contained in Premier Advantage Agreement, dated as of February 23, 2009, in favor of Konica Minolta Premier Finance.

Guaranty contained in Settlement Agreement, Guarantee and General Release, in favor of Donald Kansteiner, Margaret Kansteiner, the Donald F. Kansteiner Defined Benefit Pension Plan, and the Margaret F. Kansteiner Living Trust.

## Exhibit D

## Liabilities

1.      Ordinary course product warranty claims to the extent same arise (excluding any product liability claims that may be covered by insurance) for products manufactured and/or sold prior to the transaction date of up to $25,000 in excess of the $20,000 accrual on Anatomic Global, Inc.'s most recent balance sheet.

2.      Up to $75,000 of liabilities and obligations (including any future legal fees) associated with Anatomic Global, Inc.'s reporting to the Consumer Product Safety Commission regarding a potential fire safety hazard with 750 of its mattresses sold between May and October 2010.

3.      Certain legal fees incurred and unpaid to Bryan Cave LLP ("Bryan Cave") as of the transaction date, and reported to FXI at least 1 day in advance of the transaction date, in the amount of $204,340.*

4.      The excess dollar amount over $200,000 in recent trade credit from FXI to Anatomic Global, Inc. as of the transaction date in the amount of $238,852.+

5.      Amounts owed by Anatomic Global, Inc. or David Farley related to the Kansteiner settlement (approximately $98,000 as of May 18th).*

+ The noted Liability shall reduce the Earn Out Payment for the first Measurement Year and if such Earn Out Payment is not sufficient to cover same, the Liability shall reduce future Earn Out Payments until satisfied in full.

* One-third of the total dollar amount paid in connection with the noted Liability shall reduce the Earn Out Payment, if any, for the Measurement Year in which the Liability is paid; and one-third of such dollar amount shall reduce the Earn Out Payment, if any, in each of the two immediately following Measurement Years; provided that if the Earn Out Payments otherwise payable to Executive during such three Measurement Years are not sufficient to fully cover the amount of such Liability, then the Company shall be entitled to reduce the Earn Out Payments in the following Measurement Years until fully recovered.

## Exhibit E

### Other Liabilities

1. Agreements between Atlanta Attachment Company and Anatomic Global, Inc. ("AGI"), dated at or about September 25, 2009.

2. Vacation earned and accrued by employees but unpaid as of the transaction date, excluding David Farley.

3. Salaries and wages earned by AGI employees, but unpaid as of the transaction date.

4. Commissions earned by AGI representatives but unpaid as of the transaction date.

5. Legal fees incurred and unpaid to Stutman, Treister & Glatt PC, WinthropCouchout, and Bryan Cave (excluding $100,000 of which shall be separately paid by FXI pursuant to instructions from David L. Farley dated the date of the transaction date) and reported to FXI at least 1 day in advance of the transaction date.

6. Trade payables owed and outstanding as of the transaction date and reported to FXI on the transaction date (a copy of which is attached), excluding payables included in the trade payable listing that are addressed elsewhere in the Agreement.

7. Standard Industrial/Commercial Multi-Tenant Lease – Gross, dated as of June 6, 2005, by and between, on the one hand, AGI (as successor to Anatomic Concepts, a California corporation), and on the other hand, Club Drive Partners, a California general partnership, and Oltmans Investment Company, LLC, a Delaware limited liability company, dba Old Temescal Road Tenants-in-Common, as amended.

8. Lease Agreement, dated as of November 19, 2007, by and between WMCV Phase 3, LLC, a Delaware limited liability company, and AGI.

9. Lease of Space in International Home Furnishings Center, dated as of January 20, 2011, by and between IHFC Properties, LLC and AGI.

10. Equipment Lease, dated as of June 2007, by and between Puget Sound Leasing Co., Inc. and AGI, as amended (assigned to Dunhill Leasing).

11. Master Equipment Finance Agreement #4033, dated as of November 15, 2007, by and between AGI and Vision Capital Corporation, thereafter assigned to Pacific Coast National Bank and subsequently assigned to Sunwest Bank, with all related Schedules.

12. Premier Advantage Agreement, dated as of February 23, 2009, by and between Konica Minolta Premier Finance and AGI.

13.   Vehicle Lease Service Agreement, dated as of February 25, 2008, by and between Penske Truck Leasing Co., L.P. and AGI (as successor to Anatomic Concepts, Inc.).

14.   Master Supplier Agreement, dated as of August 14, 2009, by and between Overstock.com, Inc. and AGI.

15.   Extranet Access Agreement, Vendor Purchase Agreement, Vendor Purchase Program Agreement, Display Allowance/Upholstery, Costco Wholesale Basic Vendor Agreement (United States (2004)), and Costco Wholesale Vendor Agreement (Puerto Rico (2001)), each by and between Costco Wholesale Corporation and AGI.

16.   Agreements between Hyphen Freight Brokerage, Inc. and AGI, dated at or about March 5, 2010.

17.   Agreements between SGS SA and AGI, dated at or about May 2, 2007.

18.   Agreements between Lineage Textiles and AGI, dated at or about November 12, 2008.

19.   Agreements between Haynes Industries and AGI, dated at or about September 25, 2007.

20.   UnbeatabaleSale Vendor Set Up, by and between UnbeatableSale.com, Inc. and AGI.

21.   Agreement between Mertado Socials Deals and AGI.

22.   Employment letter, dated as of May 2011, between AGI and Ira Fishman.

23.   Employment letter, dated as of May 2011, between AGI and Rick VanderWoude.

24.   Verbal consulting agreements between AGI and each of Jeff Feltch, Darrell Nance and Neil Silverman.

25.   Manufacturing Agreement, dated June 30, 2010, by and between AGI and World Bed, Inc.

26.   Accrued sales tax obligations of AGI.

27.   Product warranty claims to the extent same arise (excluding any product liability claims to the extent to which that any such claim may be covered by AGI's then-effective insurance) for products manufactured and/or sold prior to the transaction date.

28.   Liabilities and obligations (including any future legal fees) associated with Anatomic Global, Inc.'s reporting to the Consumer Product Safety Commission regarding a potential fire safety hazard with 750 of its mattresses sold between May and October 2010.

29.     Amounts owed by Anatomic Global, Inc. or David Farley related to the Kansteiner settlement (approximately $98,000 as of May 18th).

30.     Amounts owed by Anatomic Global, Inc. to FXI, Inc. pursuant to that certain Amended and Restated Loan and Security Agreement, dated as of November 10, 2010, between Anatomic Global, Inc. and FXI, Inc. (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement") and the Debtor Documents (as defined in the Loan Agreement), excluding the Guaranty (as defined in the Loan Agreement").

## Exhibit F

### Pending and Threatened Suits and Claims

1. Sino Century Development Limited et al vs. Anatomic Global, Inc. and David L. Farley

2. Factory Direct, Inc. vs. Anatomic Global, Inc. et al.

3. Hyphen Freight Brokerage, Inc. v. Anatomic Global, Inc.

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 18101 Von Karman Avenue, Suite 510, Irvine, CA 92612.

A true and correct copy of the foregoing document described **DEBTOR'S NOTICE OF MOTION AND MOTION FOR AN ORDER APPROVING COMPROMISE OF CONTROVERSY; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID L. FARLEY IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.    TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On March 8, 2012, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

    ☒    Service information continued on attached page

**II.   SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On March 8, 2012, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

BMW Bank of North America, Inc. Department    Winthrop Couchot P.C.
P.O. Box 201347    660 Newport Center Dr., Suite 400
Arlington, TX 76006    Newport Beach, CA 92660

    ☐    Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, ~~FACSIMILE TRANSMISSION OR EMAIL~~** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on March 8, 2012, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

    The Honorable Deborah Saltzman, USBC, 3620 Twelfth Street, Riverside, CA 92501 (hand delivered)

    ☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

March 8, 2012    Susan C. Stein    /s/Susan C. Stein
*Date*    *Type Name*    *Signature*

-13-

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

- Richard J Bauer rbauer@mileslegal.com
- Jared D Bissell ecfcacb@piteduncan.com
- Michael J Bujold Michael.J.Bujold@usdoj.gov
- Jeffrey D Cawdrey jcawdrey@gordonrees.com, ebojorquez@gordonrees.com
- Marc S Cohen mcohen@kayescholer.com
- Ashleigh A Danker adanker@kayescholer.com
- Todd S Garan ecfcacb@piteduncan.com
- Robert P Goe kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Garrick A Hollander ghollander@winthropcouchot.com, gcrumpacker@winthropcouchot.com;pj@winthropcouchot.com
- Daniel C Silva dsilva@gordonrees.com, jmydlandevans@gordonrees.com
- Ramesh Singh claims@recoverycorp.com
- United States Trustee (RS) ustpregion16.rs.ecf@usdoj.gov

-14-